613 So.2d 234 (1992)
STATE of Louisiana
v.
Marcus Todd WILSON.
No. 91 KA 2080.
Court of Appeal of Louisiana, First Circuit.
December 23, 1992.
Rehearing Denied January 28, 1993.
*235 Charles Genco, Asst. Dist. Atty., Office of Dist. Atty., Livingston, for appellee.
Lewis Unglesby, Baton Rouge, for appellant.
Before CARTER and LeBLANC, JJ., and CHIASSON,[1] J. Pro Tem.
CARTER, Judge.
Marcus Todd Wilson was indicted with manslaughter, a violation of LSA-R.S. 14:31. He pled not guilty, waived trial by jury, and was found guilty as charged. The trial court sentenced him to serve a term of ten years imprisonment at hard labor, with all but one year in the parish *236 prison suspended. The court ordered that, upon his release, defendant would be placed on five years supervised probation with the following special conditions: (1) perform 250 hours of community service; (2) pay $2500 fine and court costs; (3) pay restitution for funeral and burial expenses, if requested; and (4) pay $20 monthly supervision fee.[2] Defendant has appealed, urging three assignments of error.

FACTS
On June 25, 1989, defendant and several other young men (Damien Miley, Melvin Ray "BoBo" Gentiles, Anthony Tridico, III, and Lynn Zachary) were playing pool at T & T Lounge in French Settlement. The young men were staying at Miley's grandfather's camp, which was located about a mile away, and celebrating a bachelor party for Corbin Thacker who was to be married soon. Other men had been left at the camp while these men played pool at T & T.
At about 10:00 p.m., Richard Rainey and Michael Brown arrived at T & T. Prior to this evening, Rainey and Brown did not know the young men who were attending the bachelor party. Sharon Avants, a lounge employee, testified that Rainey and Brown were "angrymean." Rainey's wife had left him that weekend, and he had consumed about seven beers before arriving at T & T. At some point, Rainey told Avants he was upset and wanted to get into a fight with someone. Avants discouraged Rainey from taking his frustrations out on innocent people, but Rainey responded that he did not have anything to worry about because he could shoot someone because of who his relatives were. While defendant and his friends were playing pool, Rainey remarked, "Don't let them hit me in the back of the head with a pool cue." At the trial, Rainey admitted he had no reason to suspect the men were going to hit him. Eventually, Avants asked Rainey and Brown to leave the bar. While they were in the parking lot, they apparently harassed defendant. When defendant told Avants about the harassment, she made Rainey and Brown leave the premises. She also warned defendant and his friends to be careful because Rainey and Brown "were packing guns."[3] Defendant told her not to worry because he also had a gun, which he showed to her.
Upon leaving the bar, Rainey and Brown parked their car at a vacant store across the highway, intending to follow defendant and his friends. Rainey admitted that defendant and his friends had been minding their own business playing pool and had not bothered him. He offered no real explanation for his decision to follow the men. After about five or six minutes, defendant's group left T & T Lounge, and Rainey and Brown followed them to the camp. Rainey testified that he and Brown had every intention of getting into a fight with the men at the camp. Fearing they would be outnumbered, Rainey and Brown drove back to the highway, where Rainey yelled at the camp. Rainey testified that he yelled, "[Y]ou got guns, you better get your guns." Rainey then heard two to three gunshots. He testified that he thought it was fireworks. However, Brown tried to convince Rainey it was gunshots.
While Rainey and Brown were hollering to the men at the camp, Tridico and Zachary each had fired a warning shot from the camp. They explained they were afraid and wanted to scare off Rainey and Brown. At one point, defendant and "BoBo" Gentiles asked Marion Guitreaux, who lived nearby, to call the police. Guitreaux testified that she called the police and that she also fired warning shots to warn the people who were threatening defendant and his group. When the police did not arrive, defendant, Zachary, and Tridico went to see *237 if anyone was around and to find the police, leaving Gentiles, Miley, and Thacker at the camp.
After having yelled threats at the camp, including the threat to return with more people, Rainey and Brown left the camp area and went to Nolan's Hangout. Rainey explained that he wanted to get help to even out the odds. At Nolan's Hangout, he recruited Hubie Leader, Scott Fontenot, and Rodney Wallace. He told the men he was going to have a fight and he wanted their help if necessary. Leaving in two vehicles, the men went to the camp.
After Rainey and his group arrived at the camp, defendant, Zachary, and Tridico drove up. The three men had been unsuccessful in locating the police, and they returned to the camp because of their concerns for the men left behind, two of whom were asleep. Before defendant, Zachary, and Tridico were able to get out of their truck, Rainey and his group exited their vehicles with their shirts off and walked toward the truck. Fontenot testified that he was concerned about the activities of his friends. He heard Rainey hollering, but he did not recall what Rainey said. Rainey denied making any threats at this point. However, defendant, Tridico, and Zachary testified that someone in Rainey's group said something to the effect of "get your guns, we got ours." Defendant, Tridico, and Zachary got out of the truck on the passenger side to avoid Rainey. Defendant quickly secured a .44 magnum pistol which was in the back of the truck and told the men to "stop."
Wallace testified that, when he saw the gun, he started backing off. However, Rainey apparently did not see the gun. He kept going toward defendant, and, as soon as he got close to defendant, defendant fired at him, wounding him in the neck. Although Rainey had been hit, he continued to come toward defendant and his group. Tridico and Zachary struck Rainey, not realizing he had been shot. Zachary described the situation as being "chaos" and "pandemonium." After the initial shot, Fontenot told Leader, "[L]et's go." The two men ran toward Leader's car. As they were running, Fontenot heard another shot. When he got into the vehicle, he told Leader to leave, but Leader said something was wrong with his arm. When Fontenot went to look at Leader's arm, he saw defendant coming toward the car with the gun. The exact distance defendant ran to reach the victim's car is not clear from the record. Fontenot and Wallace both testified for the state. Fontenot described the distance as being fifteen to twenty yards; Wallace testified that the distance was approximately thirty feet. As Fontenot ducked underneath the dash and Leader slumped over, defendant fired another shot into the car, striking Leader in the head. Tridico testified that before defendant fired the shot into the car, he had a "really scared look on his face, his eyes got big and he shot again." Defendant then yelled, "[C]ome on mother fucker's, what ya'll gonna do now?" After the three shots, defendant ordered Fontenot out of the vehicle. When he realized Fontenot was not armed, he told Fontenot to help Rainey. According to one witness, defendant was "[r]eal shook up." He repeatedly told people to call the police and get an ambulance. He also wanted to call his parents. In tears, defendant administered first aid to Rainey and sat on the ground, with Rainey's head in his lap. Rainey apologized to defendant for pushing the altercation as far as he did. Initially, some of the men were not aware that Leader had died. Tridico testified that someone in Rainey's group said not to call the police, but that they would just take Leader to the hospital.
However, Hubie Leader died at the scene. The doctor who performed the autopsy determined that the cause of death was a gunshot to the head. The doctor found a total of four wounds on the victim's body: a wound on the left rear shoulder; a grazing wound through the skin on the back of the left arm; a wound in the upper part of the right arm (with a bullet found at the elbow); and a wound on the right side of the head from the forehead to just behind the ear. The doctor speculated that the wounds on the victim were caused by three shots; however, the eyewitnesses *238 said there were only three shots, including the shot which struck Rainey. The doctor suggested that the shot which hit the victim in the right arm first struck someone else.
At the trial, defendant testified in his own defense. He explained that, prior to the final shot, he saw the victim reach down beside the seat. He thought the victim was reaching for a gun, and he did not realize the victim was trying to start his car and leave. Up to that point, defendant was not aware he had shot anyone. No one had fallen, and the men kept running. He maintained he was scared and was trying to protect himself. Defendant stated that the shooting was over "as quick as you could snap your fingers." He was eighteen years old when the offense occurred, and he had never been in trouble before. He was not really familiar with pistols and had not fired guns much before. Through a stipulation, it was established that defendant's blood alcohol level was a.116.
Defendant was arrested nearby at Guitreaux's home. After the shooting, he ran to her home crying and asked to use her phone. While he was on the phone with his parents, a sheriff's deputy arrived to arrest him. The deputy did not view defendant as attempting to flee the scene. He said defendant was cooperative and "fairly shaken up." Law enforcement officers retrieved the murder weapon and also found a shotgun and a rifle, both unloaded, in Rainey's vehicle.

SUFFICIENCY OF THE EVIDENCE
In the first two assignments of error, defendant attacks the sufficiency of the evidence. In assignment of error number one, defendant argues the court erred by not finding that defendant acted in self-defense. In assignment of error number two, defendant contends the state failed to meet its burden of proving that defendant did not act in self-defense.
When a defendant charged with a homicide claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Rosiere, 488 So.2d 965, 968 (La.1986). The elements of self-defense are established in LSA-R.S. 14:20(1):
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; ...
The relevant inquiry on appeal is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt that defendant did not act in self-defense. State v. Rosiere, 488 So.2d at 968-69. See also State v. Ducksworth, 496 So.2d 624, 630 (La.App. 1st Cir.1986).
Before finding defendant guilty, the trial court acknowledged the difficulty it had in reaching a verdict and labeled the case a "tragedy" for everyone involved. Reviewing the requirements of LSA-R.S. 14:20(1), the court determined that defendant and his friends reasonably believed they were in imminent danger of losing their lives and receiving great bodily harm. However, the court did not believe it was necessary for defendant to kill Hubie Leader to save himself from that danger. The court explained that the victim was backing off from the confrontation and that the final shot which defendant fired was fired into the car.
In State v. Mussall, 523 So.2d 1305 (La. 1988), the Louisiana Supreme Court summarized the methodology an appellate court should follow to determine objectively if any rational trier of fact would have had a subjective doubt about the defendant's guilt:
First, a review of a criminal conviction record for sufficiency of evidence does not require a court to "`ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt[.]'" Second, a reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any *239 rational fact finder can. Third, the inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.
523 So.2d at 1309-10 (footnotes with citations omitted; emphasis in original).
After reviewing the trial testimony and exhibits, we find that a rational trier of fact could conclude that the homicide was not necessary to preserve defendant's life. Defendant certainly acted in self-defense when he fired the first shot at Rainey. However, a rational trier of fact could find that, by the time he fired the final shot into the victim's car, he no longer was defending himself and had pursued the role of aggressor. Although Rainey had threatened the use of weapons, neither Rainey nor any of the other men in his group had ever displayed a weapon to defendant, nor did they respond with gunfire after defendant fired the first shot. Although defendant warned the men to "stop," only he testified (in response to a leading question) that he warned them he was armed. When the fatal shot was fired at the victim, the victim was retreating into his vehicle for safety. Defendant explained that he thought the victim was going to retrieve a weapon from the vehicle, but defendant's conduct both before and after the shooting indicates otherwise. Before the shooting, defendant had displayed the gun to Sharon Avants, showing his advance preparation for engaging in a conflict with Rainey and his friends. After the shooting, defendant shouted something to the effect of "come on mother fucker's, what ya'll gonna do now?" Defendant pursued the victim and Fontenot to the exclusion of the other three men without knowing if the other men also were attempting to secure weapons. Although defendant indicated he was afraid the victim and Fontenot were going to secure weapons, defendant had other options available to save himself and his friends. For example, he could have retreated to the camp. These circumstances support a finding that the shooting was not necessary to save defendant from danger.
Thus, we find that a rational trier of fact, interpreting all of the evidence favorably to the prosecution could have found beyond a reasonable doubt that defendant committed all the elements of the offense and did not act in self-defense. The assignments of error are without merit.

EXCESSIVE SENTENCE
In the third assignment of error, defendant asserts the sentence imposed upon him is excessive. He argues the trial court gave insufficient consideration to the mitigating factors and should have imposed a lesser sentence without any period of imprisonment.
The trial judge has wide discretion, though not unbridled, in the imposition of a sentence within statutory limits. See State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Article 1, § 20 of the Louisiana Constitution prohibits the imposition of excessive punishment. A sentence will be determined to be excessive if it is grossly disproportionate to the crime or is nothing more than the needless imposition of pain and suffering. The determination turns upon the punishment and the crime in light of the harm to society and whether or not the penalty is so disproportionate that it shocks our sense of justice. State v. Waguespack, 589 So.2d 1079, 1086 (La.App. 1st Cir.1991), writ denied, 596 So.2d 209 (La. 1992). A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. State v. Tate, 506 So.2d 546, 552 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
Given compliance with the sentencing criteria of LSA-C.Cr.P. art. 894.1, the sentence will not be set aside in the absence of manifest abuse of discretion. Article 894.1 (prior to its amendment by Acts 1991, No. 22) required the trial court to weigh both aggravating and mitigating circumstances in imposing sentence. While the trial court is not required to articulate every such circumstance in imposing sentence, the record must reveal adequate consideration of the guidelines enumerated in article 894.1. State v. Waguespack, 589 So.2d at 1086.
*240 Before imposing sentence, the trial court extensively reviewed the article 894.1 factors. He considered that defendant had no prior history of any criminal conduct and had been a good student and athlete in high school. He noted that letters from defendant's family and friends indicated defendant had "good moral character" and a "good work ethic." The court reminded that defendant's conduct caused serious harm, the victim's death. The court noted that defendant armed himself earlier in the evening, and that, when the shooting occurred, the victim was in retreat. Thus, even though defendant earlier had been "terrorized" by the victim's friends, the court felt defendant was not justified in shooting the victim. However, the court believed defendant acted under extreme provocation and did not provoke the incident. The court also recognized that defendant and his friends had tried to secure the assistance of law enforcement officials. The court found that the victim and his friends had induced the conflict and that the victim's friends had "to bear some of the moral responsibility" for the victim's death. The court concluded that the criminal conduct of defendant would be unlikely to happen again.
At the time of this offense, the maximum possible sentence for manslaughter was imprisonment for twenty-one years at hard labor. See LSA-R.S. 14:31, prior to amendment by Acts 1992, No. 306. In sentencing defendant, the court recognized the difficulty in imposing an appropriate sentence in a case such as this. After reviewing the facts of the case and the trial court's evaluations, we find the court adequately considered all of the mitigating factors and did not abuse its discretion when it decided not to suspend the entire sentence. The assignment of error is without merit.
In reviewing the record for patent error, we have found errors in the sentence. The trial court did not give defendant credit for time served. See LSA-C.Cr.P. art. 880. Accordingly, we amend the sentence to reflect that defendant is to be given credit for any time served prior to execution of his sentence. See State v. Greer, 572 So.2d 1166, 1172 (La.App. 1st Cir.1990).
Additionally, the trial court did not set a specific amount of restitution to be paid and did not definitively impose the special condition of restitution. Instead, the court imposed restitution for funeral and burial expenses "if there is a request made." When a court places a defendant on probation it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any monetary loss. LSA-C.Cr.P. arts. 895(A)(7) and 895.1(A). In the instant case, the sentence imposed is defective for failure to definitively require the restitution and for failure to state a specific amount to be paid in restitution. See State v. Gross, 517 So.2d 456 (La.App. 1st Cir. 1987).
Accordingly, although we affirm the sentence, we vacate the condition of restitution and remand this matter to the trial court for a determination of the amount of restitution. We also order the trial court to amend the commitment and the minute entry of the sentencing to reflect that defendant is to be given credit for time served.

CONCLUSION
For the above reasons, defendant's conviction and sentence are affirmed, as amended.
CONVICTION AND SENTENCE AFFIRMED, AS AMENDED, AND REMANDED WITH ORDER.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] After pronouncing the sentence, the court stated that it would defer "imposition" of the sentence and the conditions of probation pending filing of a motion for appeal. However, from other statements made by the court, it is obvious the court merely deferred "execution" of the sentence.
[3] According to Tridico, an older man at the bar also warned them to be careful because Rainey and Brown were armed.