666 So.2d 400 (1995)
STATE of Louisiana
v.
Israel Michael DAVIS.
No. 94 KA 2332.
Court of Appeal of Louisiana, First Circuit.
December 15, 1995.
*402 Jerri G. Smitko, Houma, for Appellant Israel Michael Davis.
Mark D. Rhodes, Houma, for Appellee State.
Before CARTER, PITCHER and CRAIN, JJ.[1]
PITCHER, Judge.
Israel Michael Davis[2] was indicted in counts one and three with aggravated rape, violations of LSA-R.S. 14:42(A)(2), (3), and (5), and in counts two and four with aggravated kidnapping, violations of LSA-R.S. 14:44(1). He filed a motion to suppress statements and evidence. The court denied the motion, and, pursuant to a plea agreement, defendant pled guilty to the two counts of aggravated rape, reserving his right to appeal the court's ruling on the motion to suppress. See State v. Crosby, 338 So.2d 584, 586 (La.1976). The state dismissed the other counts. The court sentenced defendant to serve concurrent terms of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, and with credit for time served. Defendant has appealed, urging five assignments of error.

PATENT ERROR
In reviewing the record for patent error, we have discovered that, after defendant's attorney filed a motion for a mental examination in which she questioned defendant's mental capacity to proceed, but before the court ruled on the motion, the court received a return on the grand jury indictment, held the arraignment, and held a pretrial conference in which the state responded *403 to defendant's discovery motion. When the question of a defendant's mental incapacity to proceed is raised, the trial court may not take any further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed. LSA-C.Cr.P. art. 642. Despite the court's failure to comply with the requirements of article 642 (insofar as the arraignment and pretrial conference were concerned), we find the error is harmless in this case. The competency hearing and the court's finding that defendant had the mental capacity to proceed occurred over three months before the guilty pleas. Defendant does not argue, nor have we found, that he was prejudiced by the court's error. See generally State v. Nomey, 613 So.2d 157 (La.1993); State v. Nicholas, 462 So.2d 1295, 1298 (La.App. 5th Cir.1985).

FACTS
Because defendant pled guilty to the offenses, the facts were not fully developed. The two offenses of aggravated rape occurred on December 13, 1992, and January 22, 1993, and involved a different female victim in each offense. Evidence introduced at the motion to suppress hearing, in particular the taped confession of defendant, reveals that defendant, Kevin Hawkins, and Kevin's younger brother committed the offenses by riding around the city of Houma until they located a young woman to abduct. In each case, when the woman got out of her car, one of the men threatened her with a gun and made her get back into her car. Eventually, the victim was taken in her own car to a particular house. The initial plan was to commit a robbery, and each time defendant promised the victim she would not be hurt. However, at the house, the men raped each victim repeatedly. The victim was threatened and led to believe she would be killed, but eventually, the men drove her to a location where they released her. Although the men completed the offense on these two dates only, they apparently drove around the city on several other occasions trying to locate other women to abduct. On at least one occasion, they actually confronted another woman, but, because that woman resisted and screamed, they were not successful in abducting her. Kevin Hawkins was indicted along with defendant, and he apparently also pled guilty to two counts of aggravated rape. His appeal is not before the Court at this time. Kevin's brother apparently died before the authorities had the opportunity to arrest him.

ADMISSIBILITY OF TEST RESULTS OF BLOOD SAMPLES
In the first assignment, defendant argues the court erred when it ruled that the results of scientific testing performed on samples of defendant's blood were admissible. In the second assignment, defendant further asserts the court erred in determining he voluntarily consented to the taking of his blood. Defendant claims the results of tests performed on his blood should have been ruled inadmissible because the police did not have probable cause to arrest when the samples were taken and his permission to provide the samples was the result of coercion. Defendant maintains he consented to the blood test only after he was subjected to three days of harassment, hours of interrogation, threats of arrest, false claims of lawful authority, and threats to secure a court order for the blood test.
Medical testing procedures have been held to constitute a search of the person. State v. Carthan, 377 So.2d 308, 311 (La.1979). A search conducted with a subject's consent (including a search involving the taking of a blood sample) is a specifically established exception to both the warrant and probable cause requirements. When the state seeks to rely upon consent to justify a warrantless search, it must demonstrate the consent was given freely and voluntarily without coercion. The voluntariness of a subject's consent to search is a question of fact to be determined by the trial court under the facts and circumstances surrounding each case, and the trial court's determinations as to the credibility of the witnesses are to be accorded great weight on appeal. State v. Wilson, 467 So.2d 503, 518 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). See also State v. Fontenot, 383 So.2d 365, 368 (La.1980).
*404 In order to evaluate the issues presented in these assignments, it is necessary to understand the events which preceded the blood test. On January 29, 1993, a woman reported an attempted abduction. This attempt resembled some unsolved rapes and kidnappings being investigated in Terrebonne Parish. Forty-five minutes after the attempt, the Sheriff of Terrebonne Parish stopped defendant for a traffic offense.
On the next day (a Saturday), Detective Johnny Lopez, of the Houma Police Department, and Detective Randy Pijor, of the Terrebonne Parish Sheriff's Office, were looking for possible crime scene locations using the description provided by the rape victims. While they were looking at a particular house, defendant stopped his vehicle and asked Pijor if he needed any assistance. Defendant also mentioned his involvement as an informant with the Narcotics Strike Force. At that time, Pijor did not consider defendant to be a suspect in the rapes. He told defendant he did not need any help, and defendant left. As defendant was leaving, Pijor realized he was the man who had been stopped by the Sheriff on the preceding night near the time of the attempt. Pijor told Lopez about defendant's offer to help, and the detectives decided to go to defendant's home to find out if he knew anything about the rapes. Lopez admitted that, at this point, they did not have any real suspects in the cases. The only information they had connecting defendant to the cases was that his car was the same color as that described by one of the victims and that he matched the general description (black male) provided by one of the victims.
The detectives went to defendant's residence and asked him if he would come to the station. They did not tell him they wanted to ask him about the rapes. Defendant readily agreed and drove his own car to the station. Before any questioning, the detectives advised defendant of his rights (as was their routine). They then told him they wanted to talk about the rapes. During two hours of questioning (from 3:00 p.m. until 5:00 p.m.), defendant denied any involvement and made no inculpatory statements. Defendant also told the detectives that on the previous evening he had been working with Agent Jimmy Little on an undercover narcotics investigation. Lopez and Pijor confirmed that defendant had been working as a paid informant with narcotics officers, but Little did not keep records of the undercover investigation and was not able to provide the specific date(s) on which defendant had worked as an informant. During the questioning, the detectives also asked defendant about an outstanding warrant for aggravated battery. In addition to investigating the rapes, Lopez also was investigating a homicide. When defendant said he might be able to get information about the homicide, Lopez agreed to put a hold on the outstanding warrant so defendant could remain on the street to get information about the homicide. During the questioning, the officers never told defendant he was considered to be a suspect in the rapes. When defendant indicated he wanted to help them any way he could, the detectives asked him to return to the station on Monday for a psychological stress evaluator test (PSE) and to give blood and saliva samples. Defendant agreed to return for the tests. Lopez specifically denied telling defendant he would be arrested on the outstanding warrant if he refused to return for the tests.
On Monday (February 1), defendant returned to the station, driving his own vehicle. He took the PSE test twice, but the results were inconclusive. The investigators asked defendant to return on the next day to take another PSE test. Pijor explained that it was not uncommon to run second and third PSE tests if the results were inconclusive. Despite the outstanding warrant for aggravated battery, Lopez again allowed defendant to leave. Lopez remained hopeful that defendant would be able to provide information about the homicide.
When defendant returned to the station on February 2, the detectives decided not to do another PSE test. Instead, they asked defendant if he would consent to a search of his vehicle and to the taking of blood and saliva samples. Defendant readily agreed and signed written forms showing his consent to the search of his automobile and to the taking of blood and saliva samples. In each *405 consent form, he was advised of the right to refuse the procedure. Both detectives testified that no force, threats, or intimidation were used to coerce defendant into consenting to the procedures. They also denied threatening to get a court order if defendant refused to consent to the blood test, and they denied pretending to place a phone call to make defendant think they were getting the court order. They further denied threatening to arrest defendant on the outstanding warrant if he did not consent. After defendant's vehicle was searched and he gave the blood and saliva samples, he was allowed to leave. He apparently was not arrested on the outstanding warrant for aggravated battery until August.
When positive results came in on DNA tests performed on defendant's blood sample, the investigating officers secured a warrant for defendant's arrest for aggravated kidnapping and aggravated rape. On October 15, 1993, he was arrested for these charges. After his arrest, he gave a videotaped confession in which he admitted his involvement in the offenses. He also discussed his reasons for consenting to the blood test. He indicated that, when Kevin Hawkins found out he had given the officers permission for the blood test, Hawkins told him he was "crazy" and must want "to get caught." Defendant explained to the investigators that he consented to the blood test so he would not look guilty. Defendant expressed familiarity with how detectives worked, and he said he knew the detectives were going to find evidence in these cases. He explained that, after talking to his girlfriend and Detectives Lopez and Pijor, he believed the detectives and his girlfriend were figuring out he had committed the rapes. Defendant also admitted in the video that he had come voluntarily to the police station on the earlier dates.
At the hearing held on the motion to suppress, defendant testified that he was brought to the station (and did not drive himself). Defendant also claimed he first refused the blood test and consented to the test only after the officers threatened to arrest him on the outstanding warrant and for impersonating a police officer (based upon the finding of a flashlight and handcuffs in his car during the search). Defendant also claimed his decision to consent to the blood test was influenced by the officers telling him they could get the samples without his consent after his arrest on the outstanding warrant or by getting a court order. Defendant maintained the officers argued with him and threatened him for a couple of hours before he consented to the test.
The court's denial of the motion to suppress reflects that it rejected defendant's testimony and accepted the testimony of Lopez and Pijor. The evidence supports the court's conclusion that defendant freely and voluntarily consented to the blood test. Although the evidence does not establish the officers had probable cause to arrest at the time when defendant consented to the blood test, there is no indication the consent was the product of an illegal arrest. An arrest occurs when the circumstances indicate an intent by the police to effect an extended restraint on the liberty of the accused, rather than at a precise time when an officer tells the accused he is under arrest. State v. Simms, 571 So.2d 145, 148 (La.1990). At the hearing, defendant admitted he offered to help the officers when he first saw them on January 30. It is apparent from the testimony of Lopez and Pijor that, instead of considering defendant to be a prime suspect in the rape cases, the officers hoped to use defendant's experience as an informant to assist them in solving the rapes and the unrelated homicide. According to the detectives, defendant drove himself to the station each time. On each date (the questioning on January 30, the PSE tests on February 1, and the vehicle search and blood and saliva tests on February 2), defendant was allowed to leave the station. Thus, it is apparent he was not being detained when he voluntarily consented to the blood test.
Accordingly, these assignments of error are without merit.

ADMISSIBILITY OF STATEMENT
In the third assignment, defendant argues the court erred when it ruled that the statement he gave after his arrest was admissible. In the fourth assignment, he further asserts the court erred in determining the statement *406 was given voluntarily and in compliance with constitutional requirements. Defendant specifically contends his statement should have been suppressed because the officers ignored his request for an attorney. He further claims that, because the blood test was the result of an illegal seizure and he was arrested only after the blood test results were positive, his statement was the fruit of an illegal search and seizure.
The state bears the burden of proving that an accused who makes an inculpatory statement or confession during custodial interrogation was first advised of his constitutional rights and made an intelligent waiver of those rights. State v. Green, 443 So.2d 531, 535 (La.1983); State v. James, 459 So.2d 28, 29-30 (La.App. 1st Cir.1984). Prior to any questioning, the accused must be advised that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). If the accused asserts his right to counsel, the current interrogation must cease, and defendant may not be approached in connection with any further criminal investigation until his counsel is present. State v. Abadie, 612 So.2d 1, 5 (La.), cert. denied, ___ U.S. ___, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993). See also Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).
The admissibility of a confession is in the first instance a question for the trial court. The court's conclusions on the credibility and weight of testimony relating to the voluntariness of the confession for the purpose of admissibility will not be overturned on appeal unless they are not supported by the evidence. State v. Daughtery, 563 So.2d 1171, 1177 (La.App. 1st Cir.), writ denied, 569 So.2d 980 (La.1990).
After defendant's arrest in October, he was questioned at the Terrebonne Parish Sheriff's Office by Agents Michael MacClean and Susan Goldsmith of the FBI. Detectives Lopez and Pijor also were present for at least portions of the interview. At the hearing held on the motion to suppress, defendant testified that before he was interviewed by the FBI agents, he told Lopez he wanted an attorney. He claimed Lopez told him the FBI agents wanted to question him and that he would have to wait until after talking to the FBI to get an attorney. Defendant also testified that, during a break in the questioning, he again told Lopez he wanted an attorney, but Lopez ignored this request. When asked about his signature on the rights form, defendant claimed he signed the form without reading it. He also explained that he did not tell the FBI agents about his request for an attorney because he felt intimidated by them.
Defendant's testimony is contradicted by the evidence presented by the state. The testimony of the FBI agents and Detectives Lopez and Pijor shows that, before the interview began, Lopez advised defendant of his Miranda rights, including the right to an attorney and the right to a court-appointed attorney. After being advised of his rights, defendant indicated he understood the rights and wanted to waive them, including the right to an attorney, and he specifically indicated his willingness to be interviewed without the presence of an attorney. Agents MacClean and Goldsmith were present when Lopez advised defendant of his rights, and they testified that defendant never requested an attorney. Lopez denied being in the interview room alone with defendant before the FBI agents came in, and he testified that defendant never told him he wanted an attorney.
This testimony supports the district court's decision that defendant waived the presence of counsel. Accordingly, the court did not err when it denied the motion to suppress on this ground.
Renewing arguments advanced in the first and second assignments of error, defendant also argues that his statement should have been suppressed because it was the fruit of an illegal search and seizure, i.e., the blood test. Defendant was arrested for the offenses after the results of the blood test came in positive. The exclusionary rule reaches not only evidence seized as a direct *407 result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." State v. Williams, 619 So.2d 650, 654 (La.App. 4th Cir.1993). However, as we have indicated, defendant voluntarily consented to the blood test. Thus, his arrest and subsequent interview are not the result of an illegal search or seizure.
These assignments of error are without merit.

EXCESSIVE SENTENCE
In the fifth assignment, defendant argues that, because he is a young man with no prior felony convictions, imposition of mandatory sentences of life imprisonment, without benefit of parole, probation, or suspension of sentence, is excessive under the Louisiana Constitution. In support of his argument, defendant cites State v. Dorthey, 623 So.2d 1276 (La.1993).
The Louisiana Constitution guarantees that "[n]o law shall subject any person to ... cruel, excessive or unusual punishment." LSA-Const. art. 1, § 20. This explicit protection against excessive punishment permits an appellate court to determine both whether the range of sentences authorized by a criminal statute is excessive and whether the sentence of the particular offender is excessive, though within the statutorily prescribed range. State v. Guajardo, 428 So.2d 468, 472 (La.1983).
The legislature has the unique responsibility to define criminal conduct and to provide for the penalties to be imposed against persons engaged in such conduct. The penalties provided by the legislature reflect the degree to which the criminal conduct affronts society. Courts must apply these penalties unless they are found to be unconstitutional. State v. Baxley, 94-2982, pp. 9-10 (La. 5/22/95), 656 So.2d 973, 979-80. Imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Additionally, imposition of a minimum sentence required under a particular statute also might violate a defendant's constitutional protection against excessive punishment. See Dorthey, 623 So.2d at 1280-81. See also State v. Pollard, 93-0660 (La. 10/20/94), 644 So.2d 370 (per curiam).
A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. Dorthey, 623 So.2d at 1280. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992).
The defendant in Dorthey had been convicted of possession of cocaine and then was charged in a multiple offender bill as a fourth felony offender. The trial court granted the defendant's motion to quash the multiple offender bill, finding that the habitual offender statute (LSA-R.S. 15:529.1), as applied in Orleans Parish, violated the Separation of Powers Clause of the Louisiana Constitution. On appeal by the state, the Supreme Court concluded that the provisions of the habitual offender statute do not violate Louisiana's constitutional separation of powers. Noting that the record showed the trial court expressed difficulty imposing the minimum sentence required by the habitual offender statute simply because defendant had been convicted for a fourth time, the Supreme Court remanded the case for resumption of the multiple bill proceedings and for a determination by the trial court as to whether or not the minimum sentence mandated for the defendant was "constitutionally excessive as applied to this particular defendant, and for appropriate sentencing." 623 So.2d at 1281 (footnote omitted). The Court explained that, if a trial court finds that a punishment mandated under the habitual offender statute makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," the court must reduce such sentence to one that would not be constitutionally excessive. 623 So.2d at 1280-81.
*408 At least one appellate court determined that Dorthey should be limited to an enhanced sentence under the habitual offender statute and should not apply to a mandatory minimum sentence imposed by a substantive criminal statute. State v. Hebert, 94-2223, p. 3 (La.App. 4th Cir. 3/16/95), 652 So.2d 1049, 1051. However, the Supreme Court's reliance on Dorthey in Baxley (a case in which the habitual offender statute was not involved) makes it clear that the principles relied upon in Dorthey also apply to a case in which the habitual offender statute has no application.
The Court in Baxley indicated that the factors outlined in State v. Telsee, 425 So.2d 1251, 1253-54 (La.1983), are useful in determining whether or not a sentence, by its excessive length or severity, is grossly out of proportion to the underlying crime. These factors include the nature of the offense and the offender, a comparison of the punishment with sentences imposed for similar crimes, the legislative purpose behind the punishment, and a comparison of the punishment provided for this crime in other jurisdictions. See Baxley, 94-2982, p. 10, 656 So.2d at 980.[3] These last two factors (legislative purpose behind the punishment and a comparison of the defendant's punishment with how he would have been punished in other jurisdictions) are more useful when a defendant claims that the nature of punishment or the range of sentences authorized by the statute are unconstitutionally excessive. Telsee, 425 So.2d at 1254.
It is well-established that the sentencing provision for aggravated rape does not facially violate the state constitutional prohibition against excessive punishment. In State v. Foley, 456 So.2d 979, 981-84 (La. 1984), the Louisiana Supreme Court considered the above factors before holding that imposition of a mandatory life sentence for aggravated rape did not violate the Louisiana Constitution. See also State v. Prestridge, 399 So.2d 564 (La.1981); State v. Kennedy, 569 So.2d 242, 246 (La.App. 1st Cir.1990), writ denied, 575 So.2d 387 (La.1991); State v. McDaniel, 515 So.2d 572, 577-78 (La.App. 1st Cir.1987), writ denied, 533 So.2d 10 (La. 1988).
In the instant case, defendant does not attack the sentences on their face. Instead he claims that, because he is young and has no previous felony convictions, imposition of life sentences is excessive. Considering the nature of these offenses and the offender, we conclude that the circumstances here do not militate against the legislature's determination that a life sentence should be imposed for aggravated rape. During the two rapes, the victims were led to believe they would be killed. When defendant pled guilty, in addition to dismissing counts two and four, the state also dismissed some other bills of information. Testimony from the hearing held on the state's request to introduce other crimes evidence shows defendant unsuccessfully attempted to abduct at least one other woman, and in the videotaped statement defendant admitted driving around looking for several other women to abduct. According to the statement given by Kevin Hawkins, on two occasions defendant impersonated a police officer, using flashing lights and a badge, and pulled over two women. According to Hawkins, when defendant returned he told Hawkins he had had sex with the women after making them think he was a police officer. Thus, despite defendant's youth and the apparent lack of any previous felony convictions, lesser sentences are not required.
Accordingly, we find no merit in this assignment of error.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Judge Hillary Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The indictment spelled defendant's first name "Isarel". However, "Israel" is used in the transcript, and also how defendant signed his own name.
[3] The proportionality review conducted under the Eight Amendment to the United States Constitution does not consider the nature of the offender. See Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).