868 So.2d 75 (2003)
STATE of Louisiana
v.
Cameron L. EMANUEL-DUNN.
No. 2003 KA 0550.
Court of Appeal of Louisiana, First Circuit.
November 7, 2003.
*77 Doug Moreau, District Attorney, Steven B. Danielson, Kory J. Tauzin, Assistant District Attorneys, Baton Rouge, for State of Louisiana.
Frederick Kroenke, Baton Rouge, for Defendant-Appellant Cameron L. Emanuel-Dunn.
Before: PETTIGREW, DOWNING, and McCLENDON, JJ.
PETTIGREW, J.
The defendant, Cameron L. Emanuel-Dunn, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty. Following a jury trial, he was found guilty as charged by unanimous verdict. The defendant moved for post-verdict judgment of acquittal and/or new trial, but the motion was denied. He was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant moved for reconsideration of sentence, but the motion was denied. He now appeals, designating three assignments of error. For the reasons that follow, we affirm the defendant's conviction and sentence.

FACTS
On May 6, 2001, the victim, Paul Broussard, Jr., was shot to death outside of Church's Chicken on Main Street in Baker, Louisiana. He suffered gunshot wounds to the front of his right armpit, to the right of his chest, and to his mouth. The victim had no contusions or scratches on any other part of his body. Prior to approaching the defendant, the victim had been sleeping in an eighteen-wheeler parked at Church's. Four .38 caliber bullet casings were discovered at the crime scene, but no weapons were recovered from the crime scene. The .38 caliber weapon used to kill the victim was retrieved from the defendant's uncle. The victim was approximately 6' 1"' tall and weighed approximately 260 lbs. No ethyl alcohol was detected in the victim's blood. However, his urine was determined to contain a metabolite of marijuana. The defendant was approximately 5' 10"' tall and weighed approximately 245 lbs. at the time of the incident.
The State presented testimony at trial from the occupants of a vehicle that was waiting in line behind the defendant's vehicle at the time of the incident. John Lorcart was the passenger in the vehicle. He saw the victim walk over to the defendant's vehicle and begin talking to the defendant. Lorcart thought the victim and the defendant knew each other because the defendant rolled down his window to talk to the victim, the defendant and the victim spoke to one another, and the victim "steady had a smile on his face." Thereafter, the victim moved back from the car, and the defendant exited the vehicle. Lorcart turned away to look for change to pay for his food, but looked back at the men after Lorcart's wife alerted him to the fact that the defendant had a gun. After seeing the defendant retrieve a pistol from under his shirt, Lorcart told his wife, who was driving, to quickly get out of the line. Lorcart then heard gunfire and took cover, but saw the victim turn "around like he was trying to get away from there to run." The defendant fired at the victim again and was "steady shooting" the victim. Lorcart saw or heard approximately five or six shots. Lorcart never saw the victim pull a gun on the defendant or hit the defendant.
Donna Heil was the driver of the vehicle behind the defendant's vehicle at the time of the incident. Heil testified she saw the victim walk to the defendant's vehicle from an eighteen-wheeler parked at Church's *78 and talk to the defendant after the defendant rolled down his window. Heil was positive the victim did not approach the defendant in an aggressive or mad manner and indicated the victim and the defendant spoke "like they knew each other." After the men spoke for a short time, the defendant exited his car. The men spoke some more, and Heil saw the victim pull on the defendant's shirt. Heil noticed the defendant had a black pistol on his side. Heil saw the defendant shoot the victim when the men were very close to each other. Following the first shot, the victim moved back, but the defendant continued shooting the victim. When asked if she had seen the victim move like he had a gun, Heil indicated the victim did not have a gun. Heil stated she did not see the victim punch or hit the defendant. Moreover, from what she observed, Heil indicated that it did not appear the defendant was acting in self-defense when he shot the victim.
The State also presented testimony at trial from Shirley McDaniel. McDaniel was taking orders from the drive-through line at Church's at the time of the incident. While taking a young man's order, she heard, "You heard me m___f___," followed by gunfire. The cursing was not directed at McDaniel. McDaniel conceded she could not tell if the person who cursed was the same person who was placing the order or whether the person who cursed was the same person who opened fire.
The defendant testified at trial. He gave the following account of the incident. While he was a passenger in a vehicle driven by Davis waiting in the drive-through line at Church's, the victim tapped on the passenger side window. The defendant rolled down his window, and the victim leaned on the window stating, "You stealing from me? You stealing from me?" The defendant asked the victim what he was talking about and told the victim he (the defendant) did not even know the victim. The defendant then exited the vehicle holding his hamburger in one hand and was immediately grabbed by both shoulders by the victim. The defendant got away from the victim briefly, but was then grabbed from behind by the victim and pinned against the car. The victim told the defendant, "Any move you make, I got you. Anything you do, I got you." The victim then "reached" on the defendant. The defendant drew his weapon, and the victim grabbed the weapon. In the ensuing struggle for the weapon, the weapon discharged. The defendant claimed the victim hit him in the mouth during the struggle and tore his T-shirt. The defendant conceded he carried a gun, he always wore a bandanna, and he had tattoos on his body stating, "Graveyard Soldier," "RIP," and "HGC," which meant "hustling to get cream."
Davis also testified at trial for the defense. Davis conceded he was the defendant's close friend and considered him a cousin. Davis gave the following account of the incident. Davis pulled up to the speaker at Church's on the night of the incident and placed his order. The victim knocked on the passenger window, and the defendant rolled down the window. The victim accused the defendant of stealing from the victim. The defendant told the victim the defendant did not know the victim and did not know what the victim was talking about. The victim again accused the defendant of stealing, and the defendant exited the vehicle. The victim "brazen[ed] up" on the defendant and continued to accuse him of stealing. The defendant continued to deny stealing, and, while going into his (the victim's) pocket, the victim grabbed the defendant on his shoulder, telling the defendant, "I got you." A scuffle ensued and the defendant broke free from the victim. Davis closed *79 the defendant's door and was about to open his own door when gunfire erupted. Davis drove off because he did not know who was shooting. He saw the victim running, and he did not see the defendant. Thereafter, Davis saw the defendant running and stopped to give him a ride. Davis claimed the entire incident lasted only a couple of seconds, and the victim was attacking the defendant during the incident.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number two, the defendant contends the evidence was insufficient to prove the crime of second degree murder but rather proved self-defense.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove, in order to convict," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438; State v. Wright, 98-0601, p. 2 (La.App. 1 Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, and XXXX-XXXX (La.11/17/00), 773 So.2d 732.
When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Wright, 98-0601 at 3, 730 So.2d at 487.
The crime of second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Lucas, 99-1524, p. 3 (La. App. 1 Cir. 5/12/00), 762 So.2d 717, 720.
When a defendant charged with a homicide claims self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
Pursuant to La. R.S. 14:20, a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." However, La. R.S. 14:21 provides that "A person who is the aggressor or who brings on a difficulty *80 cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."
The relevant inquiry on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. Rosiere, 488 So.2d at 968-969; see also State v. Wilson, 613 So.2d 234, 238 (La.App. 1 Cir.1992), writ denied, 93-0533 (La.3/25/94), 635 So.2d 238.
After a thorough review of the record, we are convinced the evidence presented herein, viewed in the light most favorable to the State, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator of that offense. The account of the incident given by the defendant and Davis was contradicted by the testimony of Lorcart and Heil. The verdict rendered against the defendant indicates the jury rejected the defendant's and Davis's accounts of the incident and accepted the accounts given by Lorcart and Heil. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 99-0385, p. 9 (La.App. 1 Cir. 11/5/99), 745 So.2d 217, 223, writ denied, XXXX-XXXX (La.11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Glynn, 94-0332, p. 32 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, 1310, writ denied, 95-1153 (La.10/6/95), 661 So.2d 464.
Additionally, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find that the evidence presented by the State established that the defendant was the aggressor in the conflict and, thus, was not entitled to claim self-defense. Further, even if it could be found that the defendant was not the aggressor, any rational trier of fact could find, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant did not act in self-defense. The defendant repeatedly shot the victim at close range and fled the scene. The defendant's flight from the scene after the incident was inconsistent with a theory of justifiable homicide. See State v. Wallace, 612 So.2d 183, 191 (La.App. 1 Cir.1992), writ denied, 614 So.2d 1253 (La.1993).
Moreover, when a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls; and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Henderson, 99-1945, p. 9 (La.App. 1 Cir. 6/23/00), 762 So.2d 747, 754, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235. No such hypothesis exists in the instant case. This assignment of error is without merit.

JURY SHIELD LAW
In assignment of error number one, the defendant contends the trial court erred in not allowing the defense to call jurors to testify as to juror misconduct and in denying the motion for a new trial and a post-verdict judgment of acquittal on the basis of juror misconduct.
Louisiana Code of Evidence article 606(B) provides as follows:
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement *81 occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict ... or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
This article clarifies the previous jury shield law but does not change the requirements for overcoming the prohibition against juror testimony. The prohibition contained in Article 606(B), and previously set forth in La. R.S. 15:470, is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. However, the jurisprudence has established that the prohibition against juror testimony is not absolute and must yield to a substantial showing that the defendant was deprived of his constitutional rights. Well-pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify. Unless such pleadings are made with particularity, jury members are not competent to testify. State v. Richardson, 91-2339, pp. 3-4 (La.App. 1 Cir. 5/20/94), 637 So.2d 709, 712.
Prior to sentencing, the defendant moved for post-verdict judgment of acquittal and/or new trial, in pertinent part, contending:
3.
After the conclusion of the trial it was revealed to the news media that one of the jurors went to the crime scene a short time after the shooting while the police officers were still present at the crime scene.[1]
4.
In addition, this same juror stated to the news media that he heard a number of jurors say the defendant was guilty before they began deliberations.
Thereafter, the State filed a motion to enforce the jury shield law.
At the hearing on the motions, the defense requested it be permitted to present testimony from juror Alexander. The court refused the defense request and denied the motion for post-verdict judgment of acquittal and/or new trial, holding the purpose of the jury shield law was precisely to prevent going back over a jury verdict.
We have conducted an exhaustive review of the voir dire examination pertinent to juror Alexander as well as the jury questionnaire completed by him. During voir dire, the prospective jurors were asked if they remembered any of the media coverage of the case. However, no response was given by any of the potential jurors. Juror Alexander was never asked if he had any personal knowledge of the facts of the case. Moreover, he was never asked if he had visited the crime scene or even knew where the crime scene was. According to an article reported in the Baton Rouge Advocate shortly after the verdict in this case, juror Alexander "happened along [the crime scene] right after [the shooting] happened." There is nothing in the record to suggest that juror Alexander visited the *82 crime scene during the trial of this matter or during jury deliberations. Although the allegation that a juror may have visited the crime scene in question is not to be taken lightly, based on the unique facts and circumstances of the instant case, we find no showing of proof that juror Alexander breached his duty as a juror.
In the instant case, the pleadings filed by the defendant did not meet the requirements of specificity. None of the complaints set forth by the defendant allege juror misconduct in the nature of constitutional violations with sufficient particularity to require or allow members of the jury to testify. The defendant alleged no fact suggesting that the jury based its verdict on prohibited factors such as coercion by a party, or inadmissible evidence of other crimes obtained from an out-of-court source. Moreover, communications among jurors, even when violative of the trial court's instructions, do not amount to "outside influences" or "extraneous prejudicial information." State v. Quiambao, 36,587, p. 11 (La.App. 2 Cir. 12/11/02), 833 So.2d 1103, 1110, writ denied, XXXX-XXXX (La.5/16/03), 843 So.2d 1130; State v. Home, 28,327, p. 6 (La.App. 2 Cir. 8/21/96), 679 So.2d 953, 958, writ denied, 96-2345 (La.2/21/97), 688 So.2d 521. This assignment of error is without merit.

EXCESSIVE SENTENCE
In assignment of error number three, the defendant contends the trial court erred in imposing a sentence herein that was unconstitutionally excessive. He argues the lack of evidence of his violent nature and the evidence and manner of occurrence of the incident required a deviation from the mandated life sentence for the offense.
In State v. Dorthey, 623 So.2d 1276, 1280-1281 (La.1993), the Louisiana Supreme Court recognized that if a trial judge determines that the punishment mandated by the Habitual Offender Law makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is "grossly out of proportion to the severity of the crime," he is duty bound to reduce the sentence to one that would not be constitutionally excessive. However, the holding in Dorthey was made only after, and in light of, express recognition by the court that, "the determination and definition of acts which are punishable as crimes is purely a legislative function." Dorthey, 623 So.2d at 1278. The court continued, noting as follows: "It is the Legislature's prerogative to determine the length of the sentence imposed for crimes classified as felonies.... Moreover, courts are charged with applying these punishments unless they are found to be unconstitutional." Id.[2]
In State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672, the Louisiana Supreme Court reexamined the issue of when Dorthey permits a downward departure from the mandatory minimum sentences in the Habitual Offender Law. Citing State v. Young, 94-1636, pp. 5-6 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223, the court noted as follows:
[T]o rebut the presumption that the mandatory minimum sentence is constitutional. *83 the defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
Johnson, 97-1906 at 8, 709 So.2d at 676.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). In the instant case, the defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. At sentencing, defense counsel moved the trial court to exercise its discretion to impose less than the mandated sentence because the defendant had no prior convictions and because of the manner in which the offense occurred. The State pointed out that the defendant had taken a man's life.
Additionally, in denying the defendant's motion to reconsider sentence, the court stated:
At the time of sentencing, the Court considered all relevant mitigating and aggravating circumstances surrounding the charge. The sentence imposed by this Court falls within the statutory guidelines recommended for this charge. The defendant makes no allegation of fact which would warrant alteration of the sentence in any way. Accordingly, the Court sees no reason to modify the defendant's sentence at this time.
A thorough review of the record indicates there was no reason for the trial court to deviate from the mandatory sentence provided for the instant offense by La. R.S. 14:30.1(B). The defendant failed to clearly and convincingly show that because of unusual circumstances, he was a victim of the legislature's failure to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. The defendant shot the victim to death and endangered the lives of numerous people present at the crime scene, including at least one child present in the vehicle behind the defendant's vehicle during the shooting. This assignment of error is without merit.

DECREE
For the above and foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The State pointed out that the newspaper article referenced in the defense motion did not indicate juror Alexander was at the crime scene while police were still present.
[2] The sentencing review principles espoused in Dorthey were not restricted in application to the mandatory minimum penalties provided by La. R.S. 15:529.1. See State v. Fobbs, 99-1024 (La.9/24/99), 744 So.2d 1274, 1275 (per curiam); State v. Davis, 94-2332, pp. 11-12 (La.App. 1 Cir. 12/15/95), 666 So.2d 400, 407-08, writ denied, 96-0127 (La.4/19/96), 671 So.2d 925.