769 So.2d 629 (2000)
STATE of Louisiana
v.
Leonard D. WILLIAMS.
No. 98-KA-1947.
Court of Appeal of Louisiana, Fourth Circuit.
August 23, 2000.
*631 Harry F. Connick, District Attorney of Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Bart Stapert, New Orleans, Louisiana, Counsel for Defendant/Appellant.
Court composed of Judge STEVEN R. PLOTKIN, Judge PATRICIA RIVET MURRAY, and Judge Pro Tem. PATRICK M. SCHOTT.
MURRAY, J.
Leonard D. Williams was convicted of first degree murder during the perpetration of an armed robbery, a violation of La. R.S. 14:30 A(1), and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. He has appealed his conviction, asserting ten assignments of error.[1] We affirm for the reasons that follow.

FACTS AND PROCEEDINGS BELOW
Shortly before 10:00 p.m. on July 11, 1994, gunshots were heard in the St. Thomas public housing development in New Orleans. The first police officers to arrive on the scene found seventeen-year-old Jerome Perry lying mortally wounded near a basketball court with an unidentified teenage girl next to him. Although the EMS team arrived quickly, Jerome was pronounced dead at the scene from two gunshots, one that entered his chest in the front and one that entered his upper back. An examination of the body and the area in which it was found suggested that Jerome had been shot in a nearby alleyway or "cut" between some buildings, then had run or crawled to where he collapsed and died.
Although several people spoke to the police at the scene, there was no indication that anyone had witnessed the shooting. Subsequent interviews with Jerome's relatives and friends established that in the thirty minutes preceding the shooting, he had been seen at various times with individuals known only as Leonard, Juvenile, Piccolo, G-Money, and Bo-Peep. About a week after the shooting,[2] a detective showed some police photos to Jerome's sister, Karen Perry, and to one of his *632 brothers, Shawn Perry, who were then able to identify Leonard Williams, aka Leonard Dillon, Marlon "Juvenile" Jackson, and Brian "Piccolo" Jenkins as some of the friends Jerome had been with before he was shot.[3] Jerome's mother, Mytrice Perry, told the police that her son had $100 cash at about 5:30 p.m., while his sister, Karen, had seen him with cash in his hand at about 9:30 p.m. However, Jerome was found with less than $1.00 in change in his pockets when he died. While further interviews suggested Jerome had last been seen walking off with Leonard Williams and Marlon Jackson, no one could provide any information about the actual shooting.
On August 1, 1994, Shawn Perry and Larvell Burham encountered Leonard Williams on the street. Shortly after the shooting, Larvell had told Shawn as well as the police that he had seen Jerome, Leonard and Marlon Jackson walking towards an alleyway at about 9:30 on the night of the murder. As Leonard and Shawn now met, Leonard started saying he did not kill Jerome. However, Shawn suddenly pulled a gun and fired several shots at Leonard, who was hit once in the leg as he tried to run away. Shawn Perry subsequently pled guilty to attempted manslaughter for this shooting, and was placed on probation. Shortly after this incident, the Perry family moved out of the St. Thomas housing development.
On August 11, 1994, Karen Perry phoned the detective handling the case and told him that her thirteen-year-old cousin, Tremice Joseph, had witnessed Jerome's murder. Tremice and her mother were brought to police headquarters, and the young woman told the detective that she had seen Jerome go into the "cut" with Marlon Jackson and Leonard Williams, who then robbed and shot him. When shown two sets of six police photos, Tremice identified Mr. Jackson as the man who had gone through Jerome's pockets and Mr. Williams as the individual who had held a gun, then fired twice when Jerome resisted and tried to escape. Based upon this information, arrest warrants were obtained for Marlon Jackson and Leonard Williams.
Mr. Williams turned himself in to the police when he learned they were looking for him. On August 31, 1994, after being advised of his rights and that he was under arrest for first degree murder, he gave a written statement regarding the events at issue. Mr. Williams admitted that, he was "hanging out" with Jerome Perry and Marlon Jackson, among others, in the St. Thomas area on the evening of July 11th. He stated that the three of them had walked alone to Rousseau Street, bought a $25-bag of heroin, then snorted it. Mr. Perry had no money, so Mr. Williams put up $15 and Mr. Jackson contributed $10 for this purchase. A while later, Mr. Perry said he was going to go to his girlfriend's house, but he did not leave immediately. Instead, Mr. Jackson decided "to go see what Tina wanted," then Mr. Williams left to visit friends in eastern New Orleans. Mr. Perry remained near the intersection of Adele and Rousseau Streets as Mr. Williams headed for the bus stop. Later that evening, while watching WWL-TV's 10:00 news at his friends' house, Mr. Williams first learned of the shooting of Jerome Perry, but was not sure that the victim was his friend because he did not know Jerome's last name.
On October 20, 1994, Leonard Williams and Marlon Jackson were indicted for the first degree murder of Jerome Perry. Mr. Williams moved to suppress his statement and any witness identifications, but these motions were denied after hearing. A joint trial of the two defendants in June 1996 resulted in a mistrial when the jury was unable to reach a verdict as to either defendant. On April 14, 1997, the State amended the indictment to reduce the charge against Marlon Jackson to second degree murder, and the two cases were *633 severed. Mr. Jackson was found guilty as charged after a jury trial held April 18, 1997.[4]
At Mr. Williams' second trial in August 1997, the jury heard the testimony of investigating police officers and the coroner, as well as that of Jerome Perry's relatives and friends who had seen him the evening of the shooting. Mr. Williams' statement to the police was admitted into evidence and copies were provided for the jurors to review. It was also established that WWL-TV news had not broadcast anything about this murder until the next day, July 12, 1994.
Tremice Joseph then testified that at some time after the 9:00 p.m. curfew, she and two friends, Sonya Johnson and Robbie Brown, were sitting on a porch below the apartment where she lived with the Perry family. She saw her cousin Jerome talking to a neighbor in the courtyard, but tried not to be seen because Jerome would make her go inside. She watched as Jerome walked away, heading into the "cut" between buildings where Marlon Jackson and Leonard Williams were standing. Mr. Williams pulled out a gun and held it on Jerome as Mr. Jackson began going through her cousin's pockets. Jerome swung at Mr. Williams, who then shot once straight at Jerome and a second time as Jerome turned and ran away. As soon as the first shot was fired, Mr. Jackson had run back towards the courtyard, passing Tremice and her friends in the process. Mr. Williams, however, fired the second shot then ran "out the back of the cut," away from Tremice, turning left where Jerome had veered to the right.
Tremice said she ran to Jerome's side after he fell near the basketball court, then ran to call for help. When she returned to the scene a crowd had gathered; she spoke to a policeman, but did not say she had seen the shooting because she was frightened and confused. Later that night, however, she told Jerome's older brother, her cousin, Albert Perry, Jr., what had happened and that she knew who killed Jerome. In the ensuing weeks, she asked Sonya and Rob to tell the police what they had seen, but they didn't want to. Tremice testified that because no other witnesses came forward, she eventually realized she would have to speak with the police.
Albert Perry, Jr. confirmed that Tremice had told him that she had seen the shooting, and that he cautioned her to wait until they moved out of the housing development before saying anything. He also testified that several days after the shooting, he saw Leonard Williams and asked what happened that night. Mr. Williams told him only that Marlon Jackson went through Jerome's pockets.
The defense presented the testimony of Deantral Martin and Carolyn Atkins, who said they had walked through the courtyard, then stood talking by the basketball court for about thirty minutes when the shooting occurred. Both stated that they did not see Tremice Joseph or her friends in the area just before the shooting, nor did they see Tremice when they went to tell Karen Perry that her brother had been shot. In addition, Sonya Johnson testified that although she and her boyfriend, Rob Brown, had been with Tremice earlier that evening, they were not with her when the gunfire was heard.
The jury found Mr. Williams guilty of first degree murder and, after the penalty phase of the trial, recommended that he be sentenced to life imprisonment. This appeal followed.

ASSIGNMENTS OF ERROR

SUFFICIENCY OF THE EVIDENCE
Mr. Williams maintains that the evidence presented by the State was insufficient *634 to sustain his conviction for first degree murder.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). While La. R.S. 15:438 requires that the elements be proven such that every reasonable hypothesis of innocence is excluded, this is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
La. R.S. 14:30 defines first degree murder as the "killing of a human being... [w]hen the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery." Armed robbery is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. Specific intent "is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10.
In the instant case, the coroner testified that Jerome Perry was killed by two gunshots, one to his chest and the other to his upper back. This is consistent with Tremice Joseph's testimony that she saw Leonard Williams fire once while facing Jerome and a second time as the victim tried to run away. Additionally, Mytrice Perry stated that her son had at least $100 earlier that evening, and Karen Perry saw cash in his hand just prior to the shooting, yet only some change was recovered from the body by the police. When combined with Tremice's testimony that Mr. Jackson rifled through Jerome's pockets, each essential element of first degree murder is proven.
Mr. Williams argues, however, that Tremice Joseph's testimony was too implausible and inconsistent to support a verdict of guilt beyond a reasonable doubt. He claims, among other things, that she could not have seen the events from the porch beneath the Perry's apartment, and insists that she came forward as a witness a month after the crime only because the family wanted to protect Shawn Perry from prosecution for the August 1st shooting. However, the witness was thoroughly cross examined at trial regarding the location from which she viewed the shooting, including certain discrepancies between her testimony at prior proceedings as well as that given by Karen Perry at trial. Additionally, both the timing and the circumstances under which Tremice came forward were emphasized in counsel's cross examination and in his closing argument to the jury. Based upon this record, the fact-finder's determination of credibility was neither irrational nor contrary to the evidence, and thus cannot be disturbed on appeal. State v. Broadway, 96-2659, p. 23 (La.10/19/99), 753 So.2d 801, 817, cert. denied, ___ U.S. ___, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000).
Therefore, viewing the evidence in the light most favorable to the prosecution, a *635 rational trier of fact could find Mr. Williams guilty of first degree murder beyond a reasonable doubt.

GRAND JURY TESTIMONY
In this assignment of error, Mr. Williams complains that the trial court erred when it failed to provide him with a transcript of Tremice Joseph's grand jury testimony. He first contends that he was entitled to review this transcript because it contained inconsistent, and therefore exculpatory, testimony. He further argues that the entire transcript should have been disclosed because the prosecutor referred to it during trial to bolster the credibility of the State's witnesses.
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986).
The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." This test is the same whether or not the defense makes a pretrial request for exculpatory evidence. Id.
A defendant is generally not entitled to a grand jury transcript. La. Code Crim.Proc. art. 434; State v. Sheppard, 350 So.2d 615 (La.1977). In an effort to balance the competing interests of Brady and the secrecy of grand jury proceedings, the Louisiana Supreme Court has authorized an in camera inspection by the trial judge of a grand jury transcript. State v. Peters, 406 So.2d 189 (La.1981). Disclosure after an in camera review for material to be disclosed under Brady and its progeny is in the sound discretion of the trial judge. State v. Trosclair, 443 So.2d 1098 (La.1983), cert. dismissed, 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984).
In the case at bar, after Ms. Joseph testified at the hearing on his motion to suppress, Mr. Williams' attorney asked the trial court to review the grand jury transcript in camera for exculpatory evidence. The court did so, ruling at the next hearing as follows:
I find no exculpatory evidence under Brady versus Maryland and its progeny. If I detect, at any time, based on my notes and my recall during the course of her testimony, if she does testify at a trial, the need to revisit this issue, I will recess immediately, outside the presence of a jury, [and] discuss the matter....
Mr. Williams now suggests that the testimony before the grand jury could have been in conflict with Ms. Joseph's trial testimony, arguing that without access to that transcript he cannot ensure that his rights have not been violated. However, the trial court apparently found no significant inconsistencies that could have been used for impeachment at trial, and there was no request at trial for a second in camera review. Furthermore, Mr. Williams produced independent testimony at trial to rebut Ms. Joseph's testimony, and emphasized the purported inconsistencies *636 discussed above. Other than Mr. Williams' speculation, there is nothing in the record to indicate that there is any exculpatory material in the grand jury transcript.
Mr. Williams also claims that because the State referred to testimony given before the grand jury "numerous times during trial," the trial court erred in denying his mid-trial request for that transcript. The record establishes, however, that there was, in fact, no mention at trial of the substance of any witness' testimony in those proceedings.[5] Although there were three instances when the prosecutor asked if the witness had testified before the grand jury, on each occasion the trial court correctly sustained defense counsel's immediate objection. Furthermore, soon after the court denied Mr. Williams' oral request for the transcript, the State was expressly instructed not to mention the grand jury again. There was no motion for any additional admonishment or for a mistrial, nor does the record as a whole suggest that these brief references substantially prejudiced Mr. Williams in the jurors' eyes.
Therefore, Mr. Williams has not established that he was deprived of any material disclosable under Brady and its progeny, nor that there is a reasonable probability of a different outcome at trial if the grand jury transcript had been furnished to the defense. The trial court did not err in ruling that the defendant was not entitled to the grand jury testimony.

IMPROPER VICTIM IMPACT TESTIMONY
Mr. Williams next asserts that the trial court improperly allowed victim impact evidence at the guilt phase of the trial, referencing emotional testimony by the victim's mother, Mytrice Perry. Although he implies that her comments were elicited by the State, the transcript establishes that Mrs. Perry only expressed her frustration with the judicial process in a brief spontaneous outburst. There was no defense objection nor a request that the jury be admonished. Accordingly, appellate review of the asserted error is precluded. La. Code Crim.Proc. art. 841.

PROSECUTORIAL MISCONDUCT
In this assignment of error, Mr. Williams contends that he was denied a fair trial because the prosecutor made repeated attempts to elicit inadmissible evidence during trial. Among other things, he complains that on direct examination, several State witnesses were asked if their testimony was the same as that given in prior proceedings, including, as previously noted, those before the grand jury. Asserting that these improper remarks and questions prejudiced the jury, Mr. Williams argues that his conviction must be reversed.
Review of the cited portions of the trial transcript reveals that in almost all instances, the court sustained defense counsel's objections to the prosecutor's improper questions. However, Mr. Williams did not subsequently seek an admonition or a mistrial. The failure to seek an admonition or mistrial after the trial court sustained his objections precludes appellate review of these errors. State v. Miles, 402 So.2d 644, 648 (La.1981).
The only time the trial court overruled defense counsel's objection was during the State's redirect examination of Ms. Karen Perry, when the prosecutor elicited her statement that her present trial testimony was the same as that given previously. Such a question allows a witness to vouch for his or her veracity and is generally frowned upon. However, in this instance, Ms. Perry's credibility had been called into question during cross-examination, resulting in the prosecutor's attempt *637 to re-establish her credibility under Evidence Code article 607 B. Accordingly, the trial court did not err when it overruled Mr. Williams' objection.

ERRONEOUS ADMISSION OF UNRELIABLE TESTIMONY
Mr. Williams also complains that the trial court erred when it denied his motion to suppress Tremice Joseph's identification testimony. He argues that both the timing of her disclosure to the police as well as the "glaring inconsistencies" in her testimony renders her identification highly suspect and unreliable.
Although couched in terms of an alleged misidentification, Mr. Williams' essential argument is that Tremice Joseph "could not have seen what she testified to," and thus should have been excluded as a witness. However, as noted in our review of the sufficiency of the evidence, the defense vigorously challenged her testimony as to all circumstances regarding her ability to view the scene, her motives for identifying Mr. Williams, and her reasons for not coming forward earlier. Because these questions of credibility are for the jury to decide, the trial court did not err when it denied the motion to suppress the identification testimony of Ms. Joseph.

INADMISSIBLE PHOTOGRAPHIC IDENTIFICATIONS
In his next assignment of error, Mr. Williams asserts that the trial court erroneously admitted identification testimony by Shawn Perry and Karen Perry. He further contends that the prosecutor's reference in closing arguments to an identification made in July 1994 led the jurors to believe that both had identified him as one of the perpetrators.[6] Mr. Williams argues that because, in fact, there was only one alleged eyewitness to the crime, the prejudicial effect of the erroneous testimony requires that his conviction be reversed.
Although the trial transcript establishes that the State was permitted to question both Shawn Perry and Karen Perry about their participation in "photo lineups," each witness specifically testified that the police detective merely asked them to point out those people they recognized as Jerome Perry's friends, i.e., Juvenile, Piccolo, G-Money, etc. Both made it clear that they knew Leonard Williams long before this murder and that neither had seen the shooting; Karen Perry further emphasized that she had not even seen Mr. Williams with her brother that night. Additionally, after sustaining defense counsel's objections to the relevance of questioning Karen Perry about this "lineup," the court stated:
Please, as everyone on the jury knows, my comment that there's even a stipulation that the lady knows these people, I'm in no way saying that either of the gentlemen [Mr. Williams and codefendant Marlon Jackson] ... committed any crime. That was just a stipulation that she knows them and has known them.
Thus, when viewed as a whole, the transcript establishes that there was little likelihood of juror confusion on this issue. Accordingly, any error in permitting Shawn Perry and Karen Perry to testify regarding their "identification" of their brother's acquaintances was harmless beyond a reasonable doubt.

UNCONSTITUTIONAL PRE-TRIAL SUBPOENAS
In this assignment of error, Mr. Williams argues that his rights under the First and Fourth Amendments to the U.S. Constitution were violated when the State was permitted to subpoena his jail visitation lists during his pre-trial incarceration. While the record reflects that these subpoenas were issued, there is nothing to indicate whether the State actually *638 obtained the documentation. Furthermore, the trial transcript establishes that no reference to this information was made during trial, nor does it appear that any evidence used by the prosecution was obtained through these subpoenas. Therefore, the ostensible violation of Mr. Williams' rights does not entitle him to a reversal of his conviction.

DENIAL OF ACCESS TO PRIOR TRANSCRIPTS
Mr. Williams next contends that because transcripts of the prior trials are not included in this appellate record, he has been deprived of the opportunity to fully present his claims for reversal and to obtain a fair and complete appellate review of his conviction.
Article 1, Section 19 of the Louisiana Constitution provides, in pertinent part, that "No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." In addition, Criminal Procedure article 843 requires that in felony cases, all proceedings shall be recorded, including the testimony of witnesses. Under these provisions, an appellant's constitutional right to judicial review of all evidence is not compromised if the record includes a complete transcript of the evidentiary portion of the trial. State v. Thomas, 92-1428, (La.App. 4th Cir.5/26/94), 637 So.2d 1272, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995). If there were no contemporaneous objections in other untranscribed portions of the record, the errors were not preserved for appeal. State v. Harrison, 627 So.2d 231, 233 (La.App. 4th Cir.1993).
In this case, the appellate record includes transcripts of all motion hearings and the trial at which Mr. Williams was convicted, including voir dire, opening statements and closing arguments. In addition, the transcript of the instant trial clearly demonstrates that Mr. Williams' defense attorney used testimony from both the 1996 joint trial and from Mr. Jackson's April 1997 trial in his cross examination of witnesses. Thus, Mr. Williams has not established that the transcripts of the earlier trials were unavailable. Furthermore, he has not presented any claim based upon, or allegedly supported by, the prior proceedings. Because the record now before this court includes all testimony and evidence on which his conviction was based, Mr. Williams has been accorded a full and complete appellate review as required by law.

CUMULATIVE EFFECT OF ERRORS
Lastly, Mr. Williams contends that he is entitled to a reversal of his conviction as a result of the cumulative prejudicial effect of all the assigned errors. However, because no substantial or prejudicial errors have been established, this argument is rejected.

ERRORS PATENT
Our review of the appellate record reveals that there is no documentation indicating that Mr. Williams was formally arraigned on the charge of first degree murder. However, Criminal Procedure article 555 provides that if the defendant enters upon the trial without objecting to the failure to be arraigned, the error is waived and it is considered as if the defendant pled not guilty. In this case, no objection was made by the defendant for the failure to arraign. Accordingly, any resultant error was waived.

CONCLUSION
Mr. Williams' conviction is affirmed for the reasons assigned.
AFFIRMED.
NOTES
[1] Mr. Williams has not appealed the sentence of life imprisonment.
[2] The exact date of this interview is not clear because some references are to July 17th while others are to July 19, 1994.
[3] "G-Money" and "Bo-Peep" are not identified in this record.
[4] Mr. Jackson's conviction and sentence to life imprisonment were recently affirmed in an unpublished opinion. State v. Jackson, 98-KA-0707 (La.App. 4th Cir.5/10/00), 761 So.2d 829.
[5] As discussed below, the State's questions were directed toward establishing that the current testimony was consistent with prior testimony, whether at the grand jury, motion hearings, or the two earlier trials.
[6] Because no objection was made to this comment during the State's closing, the alleged error has not been separately preserved for appellate review. La. Code Crim. Proc. art. 841 A.