# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1385


## STATE OF LOUISIANA

## VERSUS

## CHRISTOPHER LANE FRANCOIS, SR.


************

## APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT,
PARISH OF ST. MARTIN, NO. 03-226844,
HONORABLE JOHN E. CONERY, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.


## AFFIRMED AND REMANDED WITH INSTRUCTIONS.

**J. Phillip Haney**
**District Attorney**
**Jeffery J. Trosclair**
**Assistant District Attorney**
**St. Martin Parish Courthouse**
**St. Martinville, Louisiana 70582**
**(337) 394-2220**
**Counsel for:**
  **State of Louisiana**

**G. Paul Marx**
**Attorney at Law**
**Post Office Box 82389**
**Lafayette, Louisiana 70598-2389**
**(337) 237-2537**
**Counsel for Defendant/Appellant:**
  **Christopher Lane Francois, Sr.**

SULLIVAN, Judge.

On August 14, 2003, the State filed a bill of information charging Defendant, Christopher Lane Francois, Sr., with one count of attempted second degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30.1, one count of aggravated battery, a violation of La.R.S. 14:34, and one count of second degree kidnapping, a violation of La.R.S. 14:44.1. A plea of not guilty was entered on November 12, 2003.

Upon motion of Defendant, a sanity commission was appointed on July 14, 2003. On December 15, 2003, the trial court found Defendant able to assist counsel and proceed to trial. On the same date, Defendant was rearraigned and entered a plea of not guilty. On January 30, 2004, the State filed a second bill of information charging Defendant with unlawful possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1. The record does not indicate Defendant was arraigned on this charge.

On November 29, 2004, the matter proceeded to trial on the charge of attempted second degree murder;[1] a mistrial was granted on December 2, 2004. A second trial commenced on January 25, 2005, and the jury returned a verdict of guilty of attempted second degree murder on January 27, 2005. A Motion for New Trial was filed on February 22, 2005, which was denied. On March 1, 2005, Defendant was sentenced to forty-five years at hard labor without benefit of probation, parole, or suspension of sentence. Defense counsel orally moved for reconsideration of sentence; the motion was denied.

Defendant appealed; he assigns three errors: 1) the evidence supports a conviction for attempted manslaughter rather than attempted second degree murder; 2) the testimony of witness Randall Marshall should have been excluded because

---

[1]Defendant did not proceed to trial on the remaining charges.

there was no proof that he was unavailable; and 3) the appellate record is incomplete and does not allow a determination of whether he was subjected to double jeopardy, denying him effective assistance of appellate counsel.

### *Facts*

On June 7, 2003, Defendant entered Toshiba Vital's place of employment, Food-N-Fun in New Iberia, where he shot at her and beat her with a gun. A more detailed account of the facts is set forth under "***Sufficiency of the Evidence***."

### *Errors Patent*

All appeals are reviewed for errors patent on the face of the record. Review of the record revealed two errors patent. The first error patent involves actions taken between the appointment of a sanity commission on July 14, 2003, and the trial court's determination on December 15, 2003, that Defendant was capable of proceeding. According to La.Code Crim.P. art. 642, "[w]hen the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed."

A number of "steps" were taken during the pendency of the commission, including Defendant's arraignment, where he pled not guilty; the filing of several motions by Defendant; hearings on some of the motions filed by Defendant; and the filing of writ applications with this court which were addressed. The sanity commission panel members issued their findings that Defendant was capable of proceeding to trial on September 29, 2003 and October 23, 2003, and on December 15, 2003, the trial court found Defendant capable of proceeding to trial.

2

In *State v. Davis*, 94-2332 (La.App. 1 Cir. 12/15/95), 666 So.2d 400, *writ denied*, 96-127 (La. 4/19/96), 671 So.2d 925, the court determined that an arraignment and a pretrial conference being held during the pendency of a sanity commission were harmless errors because they occurred before the defendant pled guilty and because the defendant did not allege that he was prejudiced by the trial court's failure to comply with the requirements of Article 642. In *State v. Karam*, 02-163 (La.App. 3 Cir. 7/31/02), 834 So.2d 1003, this court concluded that motion hearings held during the pendency of a sanity commission were harmless error, as the hearings did not prejudice defendant. The court explained that the purpose of Article 642 is to insure that no action prejudicial to the defendant is taken while the sanity commission is pending.

Not all of the motions Defendant filed were resolved in his favor; however, they were pretrial in nature and were not prejudicial to him. Furthermore, Defendant does not allege that he was prejudiced by the occurrence of these "steps" during the pendency of the sanity commission. We find any error was harmless. *See State v. Prudhomme*, 99-2029 (La.App. 3 Cir. 6/5/02), 819 So.2d 443, *writ denied*, 02-2073 (La. 6/27/03), 847 So.2d 1251.

The second error patent is that the jury did not return a verdict on all of Defendant's charged offenses. Louisiana Code of Criminal Procedure Article 819 provides: "If there is more than one count in an indictment, the jury must find a verdict as to each count, unless it cannot agree on a verdict as to a count." Defendant was charged by bill of information with one count of attempted second degree murder, one count of aggravated battery, and one count of second degree kidnapping. By separate bill of information filed under the same docket number, he was charged

3

with one count of possession of a firearm by a convicted felon. The State proceeded to trial on the attempted second degree murder charge only. There is no motion to sever in the record, and the St. Martin Parish Clerk of Court's Office has submitted an affidavit, stating that the jury considered the charge of attempted second degree murder only. Accordingly, this matter is remanded for proper disposition of the aggravated battery, second degree kidnapping, and possession of a firearm by a convicted felon charges. *State v. Hypolite,* 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275.

### Sufficiency of the Evidence

Defendant was convicted of attempted second degree murder. Second degree murder is "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A)(1). Attempt is defined in La.R.S. 14:27(A), which provides:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

To convict Defendant of attempted second degree murder, the State had to prove beyond a reasonable doubt that he specifically intended to kill Ms. Vital and that he committed an "act for the purpose of and tending directly toward the accomplishing of" that intent. La.R.S. 14:27(A); 14:30.1(A)(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). It may be "inferred from the defendant's actions and the

circumstances of the transaction." *State v. Brown*, 03-897, p. 22 (La. 4/12/05), 907 So.2d 1, 18.

Defendant contends the verdict is based on insufficient evidence because he established provocation and heat of passion sufficient for attempted manslaughter and the State did not establish the offense of attempted second degree murder beyond a reasonable doubt. He urges that he was "led on" and "taken advantage of" by Ms. Vital, who allowed him to spend large amounts of money on her for a cell phone and house repairs, then told him that she was going back to her ex-boyfriend. He claims he is guilty of attempted manslaughter rather than second degree murder.

Manslaughter is defined, in pertinent part, as a killing "committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31. "'[S]udden passion' and 'heat of blood' are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them." *State v. Lombard*, 486 So.2d 106, 110 (La.1986).

On appeal, we must examine the evidence "in the light most favorable to the prosecution." *State v. Captville*, 448 So.2d 676, 678 (La.1984) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979)). If the evidence was "sufficient to convince a rational trier of fact" that all of the elements of attempted second degree murder were "proved beyond a reasonable doubt," we cannot reverse the jury's verdict. *Id.* The sufficiency of the evidence evaluation regarding the mitigatory factors of sudden passion or heat of blood is whether a rational trier of fact could have found that these factors were not proven beyond a preponderance of the

5

evidence. The evidence must be viewed in the light most favorable to the prosecution and intent may be inferred from the circumstances and defendant's conduct. *Brown*, 907 So.2d 1.

For two weeks prior to June 7, 2003, Defendant spent a lot of time with Ms. Vital. He felt they were dating and considered her his girlfriend, but Ms. Vital did not think of herself as Defendant's girlfriend. During that time, the two went to dinner several times and, on one or two occasions, Ms. Vital's daughters accompanied them; Ms. Vital went to a graduation party for Defendant's son; Defendant loaned her money to purchase a cell phone and bought her some clothing; and he performed and paid for work on a house she was to rent. Defendant claims Ms. Vital suggested that he live with her in that home. Ms. Vital testified that she informed Defendant she did not intend to live with him, but he continued to work on the house. During this time, Ms. Vital spent most nights at the home of Defendant's cousin, Crystal Francois. When Defendant was in town, he stayed at Ms. Francois' home with Ms. Vital.

On June 7, 2003, Defendant called Ms. Vital's cell phone, and her ex-boyfriend answered. During the afternoon, Ms. Vital spoke to Defendant again. She testified that Defendant told her she owed him money for the cell phone and, if he did not get it, he would kill her. Between 4:00 and 4:30 p.m., Defendant arrived at Ms. Francois' residence, and Ms. Francois relayed messages between Defendant and Ms. Vital. During that time, Ms. Francois informed Ms. Vital that Defendant told her, if he did not get the cell phone back, he would kill Ms. Vital. Defendant denied threatening Ms. Vital while at Ms. Francois' house. However, Ms. Francois testified that

6

Defendant stated, "there was going to be some trouble," if Ms. Vital did not return the cell phone to him.

Ms. Vital called the St. Martinville Police Department because of Defendant's remarks. Officer Charlotte Durand took a complaint from Ms. Vital at Ms. Francois' residence. While taking the complaint, Officer Durand spoke to Defendant on Ms. Vital's cell phone and informed him that she needed to speak to him. At approximately 5:45 p.m., Defendant went to the St. Martinville Police Department where Officer Durand explained the basis of Ms. Vital's complaint. Officer Durand testified that Defendant said, "he wouldn't go to jail for making a threat, it would be because he killed somebody." Defendant did not recall making this statement.

Later, Defendant went to Ms. Vital's place of employment, Food-N-Fun, armed with a gun. He testified that he wanted to talk to Ms. Vital about his money. He also testified that he always carried a gun. Defendant entered Food-N-Fun between 6:00 p.m. and 6:30 p.m.; Ms. Vital was on the telephone when he entered. She testified that Defendant warned the store's customers, "if you don't want to die, get the . . . out." He then told Ms. Vital, "Let's go, . . . Ride or die." Immediately after these comments, he pulled a gun and pointed it at her. She asked him to leave, but he did not. Ms. Vital testified that Defendant began firing his gun at her and that she was hit by one bullet.

After the bullet struck Ms. Vital, Defendant jumped the store counter, and the two engaged in a physical struggle. He then dragged her out of the store. Once outside, the gun no longer worked, and Defendant started beating her with it. During the struggle, Ms. Vital got the gun away from Defendant for a short time, but he

7

began to stomp her and regained control of the gun. Finally, Ms. Vital escaped and ran to the Player's Club, a casino located next door.

After the incident, Ms. Vital was transported to the hospital. Medical records prepared by Dr. Alan Appley state that she had been pistol-whipped on the head and right face and was dragged across the asphalt. Dr. Appley was unsure of whether Ms. Vital was grazed by a bullet.

Defendant testified that he pulled a gun while Ms. Vital was on the phone because he thought she was speaking to the police. He also testified that he made a comment indicating that customers should leave the store before he pulled the gun out and that the gun went off when he pulled it out. Defendant described what occurred next as follows: "Well, I came to hit Miss Vital. She grabbed my arm. When I grabbed her arm, she grabbed the gun. Then she had the gun. She took the gun from me." Defendant testified that, once Ms. Vital had the gun, she ran. The two made contact again, and Defendant testified that he started hitting her with his fist. He further testified that Ms. Vital dragged him into the parking lot and that he got the gun back when she dropped it during their struggle. He testified that the gun went off again while they were in the parking lot. He denied chasing Ms.Vital when she ran into the Player's Club, stating he "didn't go as far as that door to the Player's Club." He then threw the gun into the dumpster. Defendant testified that he did not go to the Food-N-Fun with the specific intent to kill or harm Ms. Vital.

Ms. Vital's description of what occurred on June 7, 2003, in the Food-N-Fun was substantiated by the testimony of Tyressa Wiltz, a Food-N-Fun patron in the store when Defendant entered; Kernell Gaspard, Jr., an employee of the Player's Club who watched a portion of the events that occurred on the monitor located in the Player's

8

Club; Joslyn Mitchell, also an employee of the Player's Club; and Randall Marshall, who drove up to the Food-N-Fun during the altercation between Defendant and Ms. Vital. Mr. Marshall testified that Defendant approached him after Ms. Vital ran into the casino and asked him for a ride. He refused Defendant's request. He testified that he noticed Defendant had a gun and that Defendant walked to the dumpster, threw something away, and left the parking lot.

Corporal Michael Babineaux of the St. Martin Parish Sheriff's Office (SMPSO) observed Ms. Vital after her encounter with Defendant and saw that she was bleeding very heavily from several lacerations. He located a semi-automatic handgun in the dumpster at Food-N-Fun and testified that the clip was broken. He did not notice any spent casings in the parking lot. Detective Mark Frederick of the SMPSO found a spent bullet by the cigarettes behind the counter at Food-N-Fun and a spent cartridge in the trash can behind the counter. He observed unfired rounds in the parking lot, but he could not recall whether he saw any spent rounds in the parking lot.

Marcus Guidry, Jr., former detective with SMPSO, observed Ms. Vital and testified that she was covered in blood and had a "long grazing wound that went from front to back" of her head and several bruises and cuts to her head. Ms. Vital told him that Defendant was the person responsible for her injuries. Guidry accompanied Detective Paula Smith of the St. Martinville Police Department to locate Defendant. Guidry testified that Defendant stated, "I f_ _ked up I shot her." Once Defendant was arrested, he kept repeating the above phrase, and Guidry informed Defendant that Ms. Vital was okay. Defendant then stated, "You mean I didn't kill the b_ _ _h?'" Guidry informed Defendant he had not killed Ms. Vital. Guidry testified that Defendant seemed agitated because he had not killed Ms. Vital. He further testified

that the cartridge casing and the jacket found inside Food-N-Fun were consistent with being fired from the gun found in the dumpster.

Detective Smith testified that Defendant called her at home on June 7, 2003, and told her that he had shot a girl at Food-N-Fun and wanted to turn himself in. She testified that upon learning from Guidry that Ms. Vital was not dead, Defendant said, "That m_ _ _er f_ _ king b_ _ _h. I didn't kill her," and "That m_ _ _ er-f_ _ king b_ _ _h is still alive."

Viewed in the light most favorable to the State, the jury could have found that the State proved beyond a reasonable doubt that Defendant had the specific intent to kill Ms. Vital and committed an act directly toward this object and that Defendant did not prove sudden passion or heat of blood beyond a preponderance of the evidence. Failing to return a cell phone and deceptively allowing someone to spend money on you is not sufficient provocation to deprive an average person of self-control and cool reflection. Even if it were, Defendant was aware that Ms. Vital would not return or pay for the cell phone and did not intend to live with him as early as 4:00 or 4:30 p.m. the day he attacked her. He spoke to police at 5:45 p.m., then went to Food-N-Fun between 6:00 and 6:30 p.m. Two to two and one-half hours elapsed between his initial conversation with Ms. Vital and his attack on her, which was more than sufficient time for him to regain his self-control and cool reflection. *See State v. Allen*, 94-1941 (La.App. 1 Cir. 11/9/95), 664 So.2d 1264, *writ denied*, 95-2946 (La. 3/15/06), 669 So.2d 433, where ten to fifteen minutes between a fight and the defendant's shooting into a crowd was found to be sufficient time for an average person's blood to have cooled.

This assignment lacks merit.

### Availability of Witness

Defendant contends the trial court erred in allowing the State to use the transcribed testimony of Randall Marshall from his mistrial, arguing Mr. Marshall was not proven to be "unavailable" under the Code of Criminal Procedure. He urges the use of the transcribed testimony was a denial of his right to confront and cross-examine witnesses against him.

The statement of a witness is admissible under the Code of Evidence when a declarant "cannot or will not appear in court and testify to the substance of his statement made outside of court." La.Code Evid. art. 804. A declarant is unavailable when he:

> (5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.

*Id.*

A trial court's determination that a witness is unavailable and that the witness's testimony may be used are reviewed for manifest error and will not be reversed unless there is an abuse of discretion. *State v. Ball*, 00-2277 (La. 1/25/02), 824 So.2d 1089, *cert. denied*, 537 U.S. 864, 123 S.Ct. 260 (2002). The "use of prior testimony must not impinge on the defendant's constitutional right to confront and cross-examine adverse witnesses, as guaranteed by the Sixth Amendment of the United States Constitution, Art. I, § 16 of the Louisiana Constitution, and La.Rev.Stat. § 15:273." *Id.* at 1112. Before allowing the use of prior testimony, the trial court must determine: 1) the defendant was represented at the earlier hearing; (2) the witness testified under oath; (3) the witness was cross-examined or the defendant validly

11

waived the right to cross-examination; (4) the witness was "unavailable" to testify at the trial; and (5) the State made a good faith effort to locate the unavailable witness. *Id.*

The trial court ruled Mr. Marshall's testimony was admissible, explaining:

[W]e also had a conference to discuss the unavailability of the State witness. I understand that Mr. Marshall is living out-of-state, he testified at the last trial under oath, attempts were made to reach him and subpoena him through various resources[;] he is completely unavailable.

. . . .

And the State intends to read his testimony to the jury, the same testimony he gave at the last trial. I understand the Defense objects to that and the Court will over-rule the objection and find that the witness is unavailable, the witness did testify subject to cross-examination at the earlier trial, and his testimony will be admissible.

The trial court instructed the jury on Mr. Marshall's absence from the trial:

[A] witness has been declared by the Court to be unavailable, having moved out of the state and lives in Tennessee. Service of process was attempted. All efforts were made to get him here to no avail. He did testify in a previous court hearing involving this same case under oath, subject to cross examination so I am going to allow his testimony to be read into the record by Mr. Huval.

The trial court did not set forth exactly what efforts were made to subpoena Mr. Marshall, and the record merely indicates that attempts were made to subpoena him through various resources. These efforts may fall short of the diligent and good faith efforts required to locate a witness.

A violation of a defendant's right to confrontation has been held to be subject to a harmless error analysis. *Id.* An error is harmless if the guilty verdict was "surely unattributable" to it. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081 (1993); *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So.2d 94. There was more than sufficient evidence to convict Defendant without Mr. Marshall's testimony. His

12

testimony was cumulative of the testimony of four other witnesses, who were present at the crime scene longer and witnessed more of Defendant's actions than he did. Therefore, we conclude that the jury's guilty verdict was "surely unattributable" to his testimony and any error in allowing Mr. Marshall's prior testimony to be presented to the jury was harmless.

This assignment lacks merit.

### *Denial of Effective Assistance of Counsel*

In his last assignment of error, Defendant contends the record is incomplete, and he is being denied effective assistance of appellate counsel because the record does not include the transcript of his prior mistrial; therefore, his counsel is prevented from making a determination as to whether there was a double jeopardy bar to retrial or other issues related to that disposition.

The minutes of this matter indicate that on December 2, 2004, after resting the presentation of Defendant's defense, defense counsel moved for a mistrial which the trial court granted. The second trial in this matter was held January 25-27, 2005. Defense counsel was the same in both trials.

The Fifth Amendment to the United States Constitution and Article 1, § 15 of the Louisiana Constitution of 1974 prohibit placing a person twice in jeopardy of life or limb for the same offense. La.Code Crim.P. art. 591. Double jeopardy protects an accused not only from a second prosecution for the same offense but also multiple punishments for the same criminal act. *State v. Murray*, 00-1258 (La. 9/18/01), 799 So.2d 453.

Defendant alleges that material omissions in the record require reversal of his conviction, citing *State v. Robinson*, 387 So.2d 1143 (La.1980). In *Robinson*, the

defendant's conviction was reversed because the court reporter was unable to provide the testimony of two expert witnesses whose testimony bore on whether or not the crime at issue had occurred. There is no evidence that that is the case here. The transcript of Defendant's mistrial is not included in this record because a transcript of the mistrial was never requested by trial or appellate counsel and no designation of record was filed as required by La.Code Crim.P. art. 914.1.

In *United States v. Scott*, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195 (1978), the Supreme Court held that "the Double Jeopardy Clause is not offended by a second prosecution" after a defendant's successful motion for a mistrial. Prosecutorial action intended to provoke a mistrial request is an exception to this rule. *Id.* Trial counsel did not request a transcript of the mistrial before the second trial, indicating counsel did not consider prosecutorial misconduct or double jeopardy to be an issue herein.

Louisiana Constitution Article 1, § 19 provides, in pertinent part: "No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." Article 843 of the Louisiana Code of Criminal Procedure requires that all proceedings in felony cases be recorded, "including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel." If the appellate record includes a complete transcript of the evidentiary portion of the trial, an appellant's right to judicial review of all evidence is not compromised. *State v. Williams*, 98-1947 (La.App. 4 Cir. 8/23/00), 769 So.2d 629.

Trial counsel and appellate counsel had the opportunity to, but did not, obtain a transcript of Defendant's mistrial. Defendant has been given the right to judicial

14

review of the trial in which he was convicted of attempted second degree murder as mandated by La.Const. art. 1, § 19.

This assignment of error is without merit.

### *Disposition*

Defendant's conviction is affirmed. The case is remanded for a proper disposition of the charges of aggravated battery, second degree kidnapping, and possession of a firearm by a convicted felon.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**