STATE OF LOUISIANA,
v.
NICKY A. LANDOR.
No. 2009 KA 1740.
Court of Appeals of Louisiana, First Circuit.
April 1, 2010.
April 5, 2010.
Not Designated for Publication
WALTER P. REED, District Attorney, Covington, LA, and KATHRYN LANDRY, Special Appeals Counsel Baton Rouge, LA, Attorneys for State of Louisiana.
FRANK SLOAN, Louisiana Appellate Project, Mandeville, LA, Attorney for Defendant-Appellant Nicky A. Landor.
NICKY A. LANDOR, Angola, LA, Defendant-Appellant In Proper Person.
Before: PARRO, KUHN, and McDONALD, JJ.
PARRO, J.
The defendant, Nicky Landor, was charged by bill of indictment with second degree murder, a violation of LSA-R.S. 14:30.1. He pled not guilty. Following a jury trial, the defendant was found guilty of the responsive offense of manslaughter, a violation of LSA-R.S. 14:31. The defendant filed motions for new trial and post-verdict judgment of acquittal, which were denied. He was sentenced to twenty-five years of imprisonment at hard labor. The state then filed a multiple offender bill of information. At a hearing on the matter, the defendant was adjudicated a fourth felony habitual offender. The twenty-fiveyear manslaughter sentence was vacated, and the defendant was resentenced to life imprisonment at hard labor. The defendant now appeals, designating two counseled assignments of error and three pro se assignments of error. We affirm the conviction, habitual offender adjudication, and sentence.

FACTUAL BACKGROUND
On the morning of October 4, 2006, the defendant got a ride home from Candy Dunnaway, a relative of his. The defendant lived in a mobile home with his mother on East Orleans Street in Lacombe. The night before, the defendant had slept at a friend's house while Albert Marshall and his girlfriend, Luciana Starks, slept at the defendant's house. Lacretia Chapman, an adopted child of the defendant's great aunt, also slept at the defendant's house that night. The defendant knew Luciana for many years, but knew Albert for only a few months.
When the defendant arrived at his house with Candy on October 4, Albert and Luciana had already left. Shortly thereafter, Luciana drove up. Candy left her car at the defendant's house and rode with Luciana to Brandon Pierre's house, which was about one-half mile away. Sometime around noon, Luciana, Candy, and Albert returned to the defendant's house in Luciana's car. Albert, who was driving, parked sideways across the defendant's driveway, blocking Candy's car from easy egress.
Candy got into her car preparing to leave. The defendant came outside to talk with her. The defendant left the passenger door opened. Albert approached the defendant, and the two began arguing over money. The defendant got out of Candy's car and continued to argue with Albert. Albert went to Luciana's car and retrieved a 9mm semi-automatic pistol. At this point, the witnesses gave varying versions of the sequence of events, but the consensus was that the defendant grabbed for the gun and knocked it out of Albert's hand. The two of them went to the ground wrestling over control of the gun. The defendant grabbed the gun. They both stood up, and the defendant shot Albert twice, killing htm. Shortly thereafter, the defendant fled with the gun through the woods. Several hours later, the defendant turned himself in, along with the gun, to the police.
Dr. Michael Defatta, a forensic pathologist who performed the autopsy on Albert, testified at trial that Albert was shot in his right leg and his left upper chest. Neither bullet exited Albert's body. The shot to Albert's leg shattered his femur. This shot was not immediately fatal. However, Albert would not have been able to stand up. According to Dr. Defatta, the leg shot "would have dropped the victim right there." The bullet to Albert's chest went through the lower part of his left lung and rested in the plural cavity. The direction of the wound was downward and left to right. Albert did not have any defensive wounds, or fresh burns or cuts. Dr. Defatta could not tell which of the shots were fired first. The immediate cause of death was exsanguination, resulting from the gunshot wound to the lung in combination with the gunshot wound to the leg. Based on stippling around the chest wound, Dr. Defatta estimated the range from which the gun was fired was from one foot to about three-and-onehalf feet. It was his opinion, however, that, regarding the chest wound, the gun was closer to the one-foot range because there was a very tight stippling pattern around the wound. Dr. Defatta could not estimate how far away the gun was when the leg shot was fired because there was no stippling or soot around the leg wound. Dr. Defatta noted that Albert was wearing denim jeans, which can mask gunpowder flakes and soot from sticking on the skin. Therefore, the distance the gun was from the leg when it was fired was indeterminate.
At the scene where Albert was killed, Albert was found face down in the driveway. His body did not appear to have been moved. Police officers found two 9mm casings in the grass and one live 9mm round in the driveway. Also, a third casing was found across the street. A tire iron was found in the grass near the two casings in the grass. No blood or fingerprints were found on the tire iron. The defendant's blood was found on the gun. The gun the defendant gave the police when he turned himself in was a Ruger P89 9mm semiautomatic pistol.
Candy, Luciana, and the defendant all testified at trial. Following his arrest, the defendant gave a taped statement to the police. The statement was played for the jury at trial. Each of these witnesses provided a somewhat different account of the events that transpired the day Albert was killed.
Candy testified that she picked up the defendant and dropped him off at home on the morning of October 4. Shortly thereafter, Luciana pulled up in her car. The defendant gave Luciana Albert's gun, which Albert was allegedly missing. Candy and Luciana then left in Luciana's car. Later that day, Candy, Luciana, and Albert returned in Luciana's car to the defendant's house. Albert was driving. Candy got in her own car, and the defendant got in Candy's car on the front passenger side. Luciana did not get in Candy's car because Luciana was going to ride in her own car with Albert. Albert and the defendant began arguing over money and a demand for an apology. Candy could not remember who wanted the money or the apology. The defendant got out of Candy's car, and the defendant and Albert continued to argue near the back of Candy's car. Albert walked to Luciana's car. Luciana grabbed the gun and tried to give it to Candy, but Candy refused. Albert struggled with Luciana and choked her to get the gun. Albert hit the defendant on the head with the gun. Candy thought that prior to the defendant being hit, the gun went off, but the bullet missed the defendant. Albert and the defendant wrestled over the gun, and the gun flew to the ground. They both went to the ground reaching for the gun. The defendant grabbed the gun. Candy thought the defendant shot Albert in the leg. However, she did not see the shot fired. According to Candy, during the altercation between Albert and the defendant, Candy was trying to leave in her car. However, since Luciana's car was blocking the driveway, Candy was moving Luciana's car out of the way so that she could move her own car. According to Candy, she looked up only twice during the fight. She remembered seeing the defendant with the gun, but did not remember seeing Albert. Candy testified she heard one shot when the defendant got hit over the head and another shot when she was trying to move the car. Candy also testified that she did not recall seeing the defendant with a tire iron in his hand.
Luciana testified that when she and Albert awoke at the defendant's house on the morning of October 4, Albert said his gun and money were gone. The defendant was not there, either. Albert's probation officer was looking for him. Sometime during the day, Luciana went to the defendant's house, and the defendant got Albert's gun from the trunk of his (defendant's) car. Luciana took the gun and put it in her car. Later that same day, when Luciana, Candy, and Albert went to the defendant's house, Albert told the defendant that he wanted his money. The defendant wanted an apology from Albert. As they continued to argue, the defendant pulled out a tire iron from his purse.[1] Albert went to Luciana's car to grab his gun. Luciana grabbed the gun first, but Albert choked her and got the gun from her. Albert shot at the defendant, but missed him. The defendant knocked the gun out of Albert's hand. The defendant picked up the gun and shot Albert once. Albert fell to the ground. She did not know where Albert was shot. The defendant tried to shoot again, but the gun failed to fire. The defendant pulled the slide back on the gun and shot Albert a second time. Luciana did not remember who hit whom with the gun. She also testified she did not remember seeing Albeit hit the defendant with the gun. Luciana also stated that, when they all returned to the defendant's house, Luciana got into Candy's car because she was going to ride with Candy, and Albeit was going to take Luciana's car. Luciana also stated that the defendant never sat in Candy's car, but only leaned in the car while talking to Candy. Nevertheless, according to Luciana, Luciana got into the back seat of Candy's car when only she and Candy would be riding in the car. Luciana also testified that when she and Candy went to Brandon's house on the morning of October 4, she, Candy, Brandon, and Albert smoked marijuana. Brandon testified at trial that he did not smoke marijuana that day. Dr. Defatta testified that Albert's blood screen for alcohol and drugs was negative.
Detectives Alvin Hotard and Lewis Sanders, both with the St. Tammany Parish Sheriff's Office, interviewed the defendant following his arrest. The defendant's interview was videotaped. The defendant's version of the events was as follows. The defendant did not sleep at his house on October 3, the night Albert and Luciana slept over there, because the defendant knew Albert was recently arrested. Candy picked up the defendant at his friend's house on the morning of October 4 and brought him home. Luciana pulled up shortly thereafter and she and Candy went to Brandon's house in Luciana's car. A few hours later, Luciana and Candy returned with Albert to the defendant's house. Albert told the defendant he wanted the $20 back he gave him the previous night. The defendant explained that he had spent that $20 on food he purchased for Albert. However, Albert insisted on getting his money back, and the argument between them became heated. Albert went to Luciana's car to get his gun, but Luciana grabbed the gun. Albert forced the gun from Luciana and shot at the defendant. The defendant was not hit. Albert approached the defendant and hit him in the head with the gun. The defendant grabbed for the gun, and they struggled for sole possession of the gun. During the scuffle, the gun went off, and Albert was struck in his leg. The gun then went off a second time, and Albert was again struck. According to the defendant, he was able to get the gun turned toward Albert while Albert was still holding the gun. As such, Albert pulled the trigger for both shots. The defendant also stated that, after the second shot, Albert was still staggering. Following the shooting, the defendant went back into his house to get his cigarettes. When the defendant walked back out, Albert was still standing. Afraid, the defendant ran away with the gun. When the defendant was asked during the interview when he had the tire iron in his hand, the defendant replied he had used a tire iron on his car two days prior to the incident. When asked what he did with the tire iron on the day of the shooting, the defendant said he picked up the tire iron and brought it to the front yard, but never got around to putting it in the trunk of his car because the phone rang.
At trial, the defendant testified that he had convictions for writing bad checks, aggravated battery, and distribution of cocaine. Since the defendant was on parole, and Albert's probation officer was looking for Albert, the defendant did not want Albert sleeping at his house on October 3. Regardless, the defendant let Albert and Luciana sleep at his house, while he (defendant) slept at a friend's house. The defendant told Albert that he could not have guns in his house, so Albert put his gun in the trunk of the defendant's car. About 4:00 a.m. on October 4, the defendant went back to his house, where he found Albert and Lacretia having sex in his bed. Angered, the defendant told them that by the time he returned in the morning, they had to be gone. On October 4 about 9:00 a.m., the defendant called his mother from his friend's house. The defendant's mother told him that Albert was looking for him with a gun. After Candy brought the defendant home, Luciana stopped by and got Albert's gun from the trunk of the defendant's car. Luciana and Candy then went to Brandon's house. A few hours later, Luciana and Candy returned to the defendant's house with Albert. Candy got in her car, and the defendant sat in the front-passenger seat of Candy's car. Luciana was in the back seat of Candy's car. While Candy and the defendant were talking, Luciana told the defendant that Albert needed $20. The defendant said Albert was not getting $20 from him. Albert approached the defendant and told him they needed to talk. The defendant told Albert he did not need to talk to him about anything. Albert cursed at the defendant, and the defendant told him to get out of his yard and to not come back. According to the defendant's testimony, Albert said, "I got something for you," and went to Luciana's car. Before Albert could get his gun, Luciana had gotten out of Candy's car, ran to her car, and grabbed the gun first. Luciana tried to hand the gun to Candy, to no avail. Albert slapped and choked Luciana and got the gun from her. According to the defendant, Albert approached him with the gun and said, "I told you I had something for you bitch." As the defendant turned to jump through Candy's car, Albeit fired a shot at the defendant but missed him. Albeit then walked up to the defendant and put the gun to the defendant's head. Albeit pulled the trigger, but the gun jammed. Albert hit the defendant on the head with the gun. They began fighting over the gun, and the gun fell to the ground. They both rolled around on the ground trying to get the gun. The defendant grabbed the gun, and they both stood up. The defendant told Albert to stop, but Albert moved toward him and told the defendant he would have to kill him. The defendant pulled the trigger, and the gun went "pow, pow." The defendant testified that he was not trying to kill Albert and that if he wanted to kill him, he could have shot him in the heart, head, or chest, or he could have unloaded the gun on him. After the shooting, the defendant ran into the woods with the gun. The defendant threw the gun in a ditch and went to an abandoned house where he fell asleep. When he awoke, he walked to the church, borrowed someone's cell phone, and called his mother. His mother retrieved the gun from the ditch. Later that day, the defendant turned himself in at Books-a-Million, and his mother gave the gun to Detective Hotard.
On cross-examination, the defendant admitted that he cleared a round from the gun, i.e., pulled the slide back, when he shot Albert. However, it is not clear from the defendant's testimony if he cleared a round before the first shot or the second shot. Also on cross-examination, the defendant agreed that he had told the detectives during his interview that he had never shot a gun in his life. Moments later, the defendant testified he used to go hunting with guns. When asked to explain this, the defendant testified that he meant he had never shot a gun at a human being before.
Several witnesses for the defense testified. Megan Alfonso testified that her boyfriend was Bernard Landor, the defendant's nephew. On the morning of October 4, Megan was with Bernard when Albert and Luciana came by to talk to her. Albert told Bernard, WI am going to kill your m ____ f ____ aunt, uncle, whoever the f____ he is." Bernard called his grandmother (the defendant's mother) and told her what Albeit said.
Brandon Pierre testified at trial that Luciana told him Albert was upset because the defendant stole Albert's money and gun. When Brandon spoke to Albert, Albert told him he was going to f____ the defendant up. According to Brandon, Albeit never threatened to kill the defendant. At the time of the trial, Brandon was in jail for possession with intent to distribute cocaine.
Scott Gardner, St. Tammany Parish Assistant District Attorney, testified at trial that, while he was briefly filling in for the prosecutor on this case, he met with Brandon Pierre. Mr. Gardner took notes during his conversation with Brandon. According to Mr. Gardner, Brandon told him that hours before Albert was shot and killed, Albert said the defendant had taken a gun and money from him, he was angry with the defendant, and that he intended to kill the defendant. Later, however, Albert got his gun back from the defendant. Thus, Albert was less angry, but he still intended to physically assault the defendant when he saw him. Brandon believed that Albert no longer wanted to kill the defendant.

COUNSELED ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, the defendant argues the evidence was insufficient to support the conviction for manslaughter. Specifically, the defendant contends that the state did not prove beyond a reasonable doubt that he did not kill Albert in self-defense.
A conviction based on insufficient evidence cannot stand as it violates due process. See U.S. Const, amend. XIV, § 1; LSA-Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also LSA-C.Cr.P. art. 821(B); State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that, in order to convict, the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patorno, 01-2585 (La. App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
Although the defendant was charged with second degree murder, he was found guilty of manslaughter. Guilty of manslaughter is a proper responsive verdict for a charge of second degree murder. LSA-C.Cr.P. art. 814(A)(3). Louisiana Revised Statute 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the fact finder finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. LSA-R.S. 14:31(A)(1). The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. State v. Maddox, 522 So.2d 579, 582 (La. App. 1st Cir. 1988). Manslaughter requires the presence of specific intent to kill or inflict great bodily harm. See State v. Hilburn, 512 So.2d 497, 504 (La. App. 1st Cir.), writ denied, 515 So.2d 444 (La. 1987).
Louisiana Revised Statute 14:20 provides, in pertinent part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
Louisiana Revised Statute 14:21 provides:
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Cousan, 94-2503 (La. 11/25/96), 684 So.2d 382, 390. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. Specific intent need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. Thus, it is necessary that a determination be made as to whether the circumstances presented support the jury's finding that the defendant had the specific intent to kill or to inflict great bodily harm. State v. Spears, 504 So.2d 974, 977 (La. App. 1st Cir.), writ denied, 507 So.2d 225 (La. 1987).
In the instant matter, the victim's death was proved. Deliberately pointing and firing a deadly weapon at close range are circumstances that support a finding of specific intent to kill. State v. Broaden, 99-2124 (La. 2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Accordingly, the defendant clearly had the specific intent to kill or to inflict great bodily harm upon Albert. Therefore, the only remaining issue in a review of the sufficiency of the evidence is whether or not the defendant acted in self-defense.
When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. Spears, 504 So.2d at 978. Thus, the issue in this case is whether a rational fact finder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant did not kill the victim in self-defense. The guilty verdict of manslaughter indicates that the jury accepted the testimony of the prosecution witnesses insofar as such testimony established that the defendant did not kill Albert in self-defense.
In finding the defendant guilty of manslaughter in this case, it is clear the jury rejected the claim of justifiable homicide. As the triers of fact, the jurors were free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 99-0385 (La. App. 1st Cir. 11/5/99), 745 So.2d 217, 223, writ denied, 00-0829 (La. 11/13/00), 774 So.2d 971. The jurors obviously did not choose to believe the defendant's claim of self-defense. They may have chosen to believe Luciana's version of events and determined that the aggressor doctrine applied, since the defendant escalated the conflict by arming himself with a tire iron without having been threatened. See State v. Loston, 03-0977 (La. App. 1st Cir. 2/23/04), 874 So.2d 197, 205, writ denied, 04-0792 (La. 9/24/04), 882 So.2d 1167. Arguably, Albert became the aggressor when he removed himself briefly from the contentious encounter, but then returned to confront the defendant with a gun. However, based on the testimony of Luciana, Candy, and the defendant, following the struggle between the defendant and Albert over the gun, the defendant managed to gain control of the gun. With the gun now in his possession, the defendant chose to shoot Albert twice. The jury may have determined that the defendant did not reasonably believe he was in imminent danger of losing his life or receiving great bodily harm when he shot Albert, and did not act reasonably under the circumstances. See Loston, 874 So.2d at 205. Further, the jury may have determined the defendant became the aggressor when he shot Albert, who was unarmed, and particularly in light of testimony which suggested the defendant shot Albert in the leg, re-chambered another bullet in the gun, and then shot Albert as he lay defenseless on the ground with a shattered leg. In any event, when he had control of the gun, the defendant could have simply walked away and called the police. Louisiana jurisprudence has been consistent in its treatment of the scenario where a victim/aggressor is disarmed. The appellate courts have found repeatedly that during such encounters, where the defendant disarms the victim/aggressor and then kills him or uses the victim's/aggressor's own weapon against him to kill or injure him, the defendant becomes the aggressor and loses the right to claim selfdefense. See State v. Bates, 95-1513 (La. App. 1st Cir. 11/8/96), 683 So.2d 1370, 1375-77; State v. Pittman, 93-0892 (La. App. 1st Cir. 4/8/94), 636 So.2d 299, 302-03; State v. Smith, 490 So.2d 365, 369-70 (La. App. 1st Cir.), writ denied, 494 So.2d 324 (La. 1986); State v. Patton, 479 So.2d 625 (La. App. 1st Cir. 1985). See also State v. Mackens, 35,350 (La. App. 2nd Cir. 12/28/01), 803 So.2d 454, 460-61, writ denied, 02-0413 (La. 1/24/03), 836 So.2d 37; State v. Jenkins, 98-1603 (La. App. 4th Cir. 12/29/99), 750 So.2d 366, 376-77, writ denied, 00-0556 (La. 11/13/00), 773 So.2d 157; State v. Stevenson, 514 So.2d 651, 655 (La. App. 2nd Cir. 1987), writ denied, 519 So.2d 141 (La. 1988).
Based on the defendant's own account of the incident reflecting that he shot Albert after disarming him, a rational trier of fact could have reasonably concluded that the killing was not necessary to save the defendant from the danger envisioned by LSA-R.S. 14:20(1) and/or that the defendant had abandoned the role of defender and had taken on the role of an aggressor and, as such, was not entitled to claim self-defense. See LSA-R.S. 14:21; see also Bates, 683 So.2d at 1377.
Moreover, the defendant's omissions and actions, after he left the scene, of failing to report the shooting, running to hide, and disposing of the weapon[2] are inconsistent with a theory of self-defense. See State v. Emanuel-Dunn, 03-0550 (La. App. 1st Cir. 11/7/03), 868 So.2d 75, 80, writ denied, 04-0339 (La. 6/25/04), 876 So.2d 829; State v. Wallace, 612 So.2d 183, 191 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1253 (La. 1993). A finding of purposeful misrepresentation, as in the case of flight following an offense, reasonably raises the inference of a "guilty mind." State v. Captville, 448 So.2d 676, 680 n.4 (La. 1984). Further, the defendant lied to the police following his arrest. During his interview, the defendant stated that both he and Albert had possession of the gun when it went off and that Albert pulled the trigger for both shots. At trial, the defendant stated that he had control of the gun and that he shot it. Lying has been recognized as indicative of an awareness of wrongdoing. See Captville, 448 So.2d at 680 n.4. Accordingly, the jury's rejection of the defense of justifiable homicide is supported by these circumstances.
An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83; See LSA-Const. art. V, § 10(B). The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir. 1985).
After a thorough review of the record, we find that there was sufficient evidence to support the jury's verdict. We are convinced that viewing the evidence in the light most favorable to the state, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant did not kill his victim in self-defense and, as such, was guilty of manslaughter.
This assignment of error is without merit.

COUNSELED ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, the defendant argues the minute entry should be corrected. Specifically, the defendant contends the minute entry should reflect the sentence imposed by the trial court as indicated by the sentencing transcript.
The minute entry indicates the defendant was sentenced to life at hard labor without benefit of probation, parole, or suspension of sentence. The sentencing transcript indicates the trial court sentenced the defendant to life at hard labor but did not indicate the sentence was to be served without benefits.
The defendant was sentenced properly under LSA-R.S. 15:529.1(A)(1)(c)(ii), which requires the defendant be imprisoned for the remainder of his natural life without benefit of parole, probation, or suspension of sentence. Therefore, the minutes are correct. Further, the trial court's failure at sentencing to indicate the defendant's sentence was to be served without benefits in no way affects the statutory requirement under LSA-R.S. 15:529.1(A)(1l)(c)(ii) that the sentence be served without benefits. The defendant's sentence, by virtue of LSA-R.S. 15:301.1(A), is deemed to contain the provisions relating to the service of his sentence without benefits. Accordingly, neither the minutes nor the transcript requires correction.
This assignment of error is without merit.

PRO SE ASSIGNMENTS OF ERROR NOS. 1 and 2
In his first and second pro se assignments of error, the defendant argues, respectively, that the evidence was insufficient to support the conviction for manslaughter because the state did not prove he did not kill Albert in self-defense, and that the trial court erred in denying his motion for post-verdict judgment of acquittal. The defendant's insufficiency of evidence claim has already been addressed in the first counseled assignment of error, and the defendant's second pro se assignment of error is subsumed by the insufficiency of evidence discussion.
These pro se assignments of error are without merit.

PRO SE ASSIGNMENT OF ERROR NO. 3
In his third pro se assignment of error, the defendant argues the trial court erred in failing to quash the multiple offender bill of information. Specifically, the defendant contends the state could not seek to enhance his manslaughter sentence based on a predicate conviction already used to adjudicate him a second felony habitual offender.[3]
The three predicate convictions used to adjudicate the defendant a fourth felony habitual offender were distribution of cocaine,[4] issuing worthless checks,[5] and second degree battery.[6] According to the multiple offender bill of information, for his distribution of cocaine conviction, the defendant "[p]led Guilty to a Double Bill and was sentenced to 15 years at hard labor on a double bill." The state does not indicate in this bill the predicate conviction that was used to enhance his sentence for distribution of cocaine. In his pro se motion to quash the multiple offender bill of information, the defendant indicated it was his second degree battery conviction that was used to enhance his sentence for distribution of cocaine. According to the defendant in that pro se motion, he was sentenced to five years for the distribution of cocaine conviction; then as part of a plea agreement, he pled guilty to a "double bill" and was resentenced to fifteen years. The defendant references the minutes of the distribution of cocaine conviction in support of his assertions. The minutes of the distribution of cocaine conviction, however, indicate only that the defendant pled guilty on October 16, 1998, to distribution of cocaine and was sentenced to fifteen years at hard labor, the first five years without benefits. The last sentence of the minutes states: "Further, the Court informed the defendant that as part of the plea agreement, should the State file a Multiple Offender charge against the defendant a sentence of fifteen (15) years will be imposed."
In any event, the defendant on appeal is now arguing that the state breached the plea agreement obtained in his distribution of cocaine conviction. According to the defendant, the distribution of cocaine sentence has already been enhanced by the second degree battery conviction. As such, the use of the "same set of prior conviction[s]" to adjudicate the defendant a fourth felony habitual offender subjected the defendant to "Double Jeopardy and Double Enhancement" and breached the plea agreement of the distribution of cocaine guilty plea. Since the distribution of cocaine conviction was not used to enhance any sentence, it appears that the thrust of the defendant's argument is that the state improperly used the second degree battery conviction twice  first to enhance the distribution of cocaine sentence as a second felony habitual offender, and later to enhance the present manslaughter sentence as a fourth felony habitual offender.
Initially, we note that the plea agreement was not breached. The minutes at issue suggest that the only terms of the plea agreement were that the defendant would receive a sentencing cap of fifteen years, if he were to be adjudicated a second felony habitual offender. When the defendant was, in fact, "double bill[ed]" and received a fifteen-year sentence, the terms of the plea agreement were fulfilled.[7] As such, that agreement, whose terms had been satisfied, had no bearing on future convictions or future adjudications as a habitual offender.
As to the defendant's argument that the same predicate conviction cannot be used to enhance separate habitual offender sentences, it is meritless. There is no prohibition against using the same conviction multiple times in separate multiple offender proceedings to establish defendant's multiple offender status and enhance the defendant's sentence as to the new crime. See State v. Ayche, 07-753 (La. App. 5th Cir. 3/11/08), 978 So.2d 1143, 1154, writs denied, 08-2291 (La. 1/30/09), 999 So.2d 752, and 08-1115 (La. 2/13/09), 999 So.2d 1140. See also State v. Shaw, 06-2467 (La. 11/27/07), 969 So.2d 1233, 1244-45; State v. Pearson, 03-652 (La. App. 5th Cir. 12/9/03), 861 So.2d 283, 288, writ denied, 04-0166 (La. 6/4/04), 876 So.2d 73, cert. denied, 543 U.S. 1007, 125 S.Ct. 626, 160 L.Ed.2d 471 (2004); State v. Brooks, 99-478 (La. App. 3rd Cir. 12/8/99), 756 So.2d 336, 342-43, writ denied, 00-1492 (La. 5/25/01), 792 So.2d 750.
In his pro se brief, the defendant cites State v. Firmin, 354 So.2d 1355 (La. 1978) (per curiam), and State v. Sanders, 337 So.2d 1131 (La. 1976), and states that, as applied in Firmin, the rule of Sanders "prevents double use of any particular prior felony conviction." The defendant's reliance on these cases is misplaced. Firmin and Sanders, which addressed the state's use of a LSA-R.S. 14:95.1 conviction (carrying a concealed weapon by a convicted felon) in charging a defendant as a multiple offender, have no applicability to the instant matter. Moreover, Firmin and Sanders have been overruled. See State v. Baker, 06-2175 (La. 10/16/07), 970 So.2d 948, 958, cert. denied, ___ U.S. ___, 129 S.Ct. 39, 172 LEd.2d 49 (2008).
This pro se assignment of error is without merit.
CONVICTION, HABITUAL OFFENDER ADJUDICATION, AND SENTENCE AFFIRMED.
McDonald, J., dissents:
I respectfully dissent and believe the evidence indicates the defendant was acting in self-defense and the homicide was justifiable. The majority takes the position that the defendant had disarmed the victim and the killing was not necessary to save him. Thus, the defendant had abandoned the role of defender and taken on the role of aggressor. I believe this is legally incorrect.
There is no question that the defendant was the original victim. Candy testified that Albert hit Landor on the head with a gun and she thought the gun went off, but Landor was not hit. Luciana stated that Albert shot at Landor, but missed him and Landor knocked the gun out of Albert's hand. The defendant's taped statement was that Albert forced the gun from Luciana and shot at him. Albert then approached him and hit him in the head with the gun. At the trial, Landor declared that Albert shot at him but missed and then put the gun to his head and pulled the trigger, but the gun did not fire. He acknowledged that Albert then hit him in the head. They all agreed that Albert and Landor wrestled over the gun, Landor was able to grab it and he shot Albert twice. There is some disagreement about whether he had to chamber a round prior to firing the weapon.
The majority posits that "appellate courts have found repeatedly that during such encounters where the defendant disarms the victim/aggressor and then kills him or uses the victim/aggressor's own weapon against him to kill or injure him, the defendant becomes the aggressor and loses the right to claim self-defense." However, none of the cases cited by the majority involved the use of a firearm. Almost all involve "overkill" by the defendants who stabbed the victim numerous times or continued to kick, stomp, and beat the victim who was on the ground.
In State v. Bates the defendant took a knife away from the female victim and then stabbed her. In State v. Pittman after chasing the defendant into the yard, the victim threw away the knife prior to the fight taking place. "The defendant then continued beating the victim, who appeared to be unconscious. This version of the incident indicates that the defendant was clearly in control of the situation, the victim was completely defenseless, and a continued beating was unnecessary." Supra, at 303. In State v. Smith the defendant testified that he was attacked by his wife who was armed with a kitchen knife. However, Mrs. Smith's body had sixteen lacerations of various lengths, including some defense wounds on her hands and arms. The fatal wound was a stab wound in her back, approximately four inches deep. Additionally, there were four small puncture wounds in her abdomen, which were made with an ice pick or other similar object. In State v. Patton the defendant was able to flip the victim over his back at which time he dropped his knife. The defendant, using his own knife, then stabbed the victim twice, once in the face and once in his side. In State v. Mackens, supra, the defendant stated that he was stabbed twice. The court found "that Donna died from a total of five stab wounds and one slash wound. Dr. Hayne testified that there were a total of nine stab wounds, which included penetrating wounds to the chest, three stab wounds to the left lung, one to the heart, and another to the right lung. The slash wound was found across the front surface of Donna's neck. ..Donna was 5 feet, 7 inches tall and weighed 130 pounds, while Mackens is six feet tall and weighs approximately 240 pounds." Supra, at 460. In State v. Jenkins the defendant disarmed the victim and stabbed him numerous times. Once the small knife bent he found a larger knife and continued to stab the victim for a total of fourteen stab wounds. In State v. Stevenson, supra, the defendant took a stick away from the victim and hit him knocking him to the ground where he continued to hit him with the stick and also stomped on him. All of these cases are clearly distinguishable from the elements before us.
The nature of the use of a firearm differs significantly from the use of a knife. It is too easy to sit back at our desks and unemotionally reflect on this highly emotional, excited, fiery encounter. The fact that the defendant fired the gun twice does not negate the justification and self-defense aspect of this conflict.
For these reasons I respectfully dissent.
NOTES
[1] The defendant is a homosexual who lives as a woman in his mind.
[2] In the instant matter, the defendant disposed of the gun by throwing it into a ditch after shooting Albert and leaving the scene. The defendant's mother subsequently retrieved the gun and gave it to the police.
[3] Both a counseled and pro se motion to quash the multiple offender bill of information were filed prior to the multiple offender hearing and the defendant's adjudication as a fourth felony habitual offender.
[4] This conviction was on October 16, 1998, under docket number 281045 of the 22nd JDC.
[5] This conviction was on September 30, 1994, under docket number 229654 of the 22nd JDC.
[6] This conviction was on March 30, 1993, under docket number 209114 of the 22nd JDC.
[7] We note that the sentencing range under LSA-R.S. 40:967(B)(4)(b) in 1998 for distribution of cocaine was a term of imprisonment at hard labor for not less than five years nor more than thirty years, with the first five years being without benefits. Moreover, the sentencing range under LSA-R.S, 15:529.1(A)(1)(a) for a second felony habitual offender was a determinate term of imprisonment for not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.